IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2012 Session

**DAVID G. HOUSLER, JR. v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 39217     John H. Gasaway, III, Judge**

---

**No. M2010-02183-CCA-R3-PC - Filed September 17, 2013**

---

The Petitioner, David G. Housler, Jr., filed petitions for post-conviction relief and writ of error coram nobis in the Montgomery County Circuit Court, seeking relief from his convictions for four counts of felony murder and resulting consecutive sentences of life in confinement. After an evidentiary hearing, the post-conviction court granted the petitions. On appeal, the State contends that the court erred by finding that the Petitioner was entitled to any relief. Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's granting the petition for post-conviction relief but conclude that the court erred by granting the petition for writ of error coram nobis. Nevertheless, because the Petitioner has shown that he is entitled to post-conviction relief based upon his receiving the ineffective assistance of counsel at trial, the case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; and Joseph Baugh, District Attorney General, for the appellant, State of Tennessee.

Paul A. Hemmersbaugh, Bryson Bachman, James Owens, Jason Vendel, and Michael J. Flanagan, Washington, DC, and Susan L. Kay and Ben Bolinger, Nashville, Tennessee, for the appellee, David G. Housler, Jr.

**OPINION**

## I. Factual Background

In the early morning hours of January 30, 1994, four employees of the Taco Bell in Clarksville were shot and killed during a robbery. State v. Housler, 193 S.W.3d 476, 479 (Tenn. 2006). In June 1996,[1] a jury convicted Courtney B. Mathews, a part-time employee of the restaurant and a soldier stationed at Fort Campbell, Kentucky, of the murders and robbery. Id. at 481. Mathews was sentenced to life without the possibility of parole. Id.

On March 7, 1994, police officers interviewed the Petitioner, also a soldier stationed at Fort Campbell. Id. at 482. At the time of the interview, the Petitioner was a suspect in a robbery committed in front of Grandpa's Hardware Store in Clarksville about one week before the Taco Bell crimes. Id. During the interview, the Petitioner denied any involvement in the Taco Bell robbery or the robbery outside Grandpa's. Id. However, he was later charged with aggravated robbery for the Grandpa's robbery. Id. While the Petitioner was being held on that charge, he told pretrial counsel that he had information about the Taco Bell crimes and entered into an agreement with the State to serve as a witness against Mathews in return for a reduced bond and a lesser charge on the Grandpa's robbery. Id. On March 21, 1994, the Petitioner gave a statement in which he said the following:

> He met Mathews during a party at [a] trailer in Oak Grove, Kentucky[,] on January 21, 1994. Mathews said in the presence of several people, including Housler, that he had a place to rob--his place of work--and that when he did it, he would not leave any witnesses. He also stated that once he committed the robbery, they could read about it in the newspapers. Housler said that he did not see Mathews again until March 15, when the two were in jail. Housler claimed that Mathews admitted committing the Taco Bell murders and giggled about it. Mathews also claimed to have attempted suicide while in jail. Housler also mentioned that his first statement to investigators on March 7 was not truthful because he did not want to get involved.

Id. After giving the statement, the Petitioner was released on bond, and he returned to Kentucky. Id.

---

[1]The supreme court opinion mistakenly states that Mathews was convicted in June 1994.

In October 1995,[2] authorities asked the Petitioner to return to Clarksville to resolve inconsistencies between his statements and information gathered from other sources. Id. On October 11, 1995, the Petitioner admitted to encouraging Mathews to commit the Taco Bell robbery and became a suspect in the murders. Id. On October 19, 1995, the Petitioner entered into a "proffer agreement" with the State, agreeing to provide truthful information about the murders and to serve as a witness against Mathews in return for a fifteen-year sentence for conspiracy to commit murder for the Taco Bell crimes and a four-year sentence for the Grandpa's robbery, to be served concurrently. Id.

The next day, October 20, 1995, the Petitioner and pretrial counsel met again with the district attorney general, and the Petitioner gave the following written statement:

> Housler met Mathews at the trailer in Kentucky about a week before the Taco Bell murders. At the party, Mathews, Housler, and Charlie Brown talked about robberies and other crimes that each had committed. Housler said that he bragged about committing the robbery outside Grandpa's. Mathews brought up the idea of robbing the place where he worked. Mathews said he would go in and leave no witnesses. Housler told Mathews that he doubted he would commit the crime but, if Mathews would, he would go with him. When Housler asked Kevin "Red" Tween if he knew about the plan, Tween responded, "[W]hatever, whenever." Melanie Darwish then approached Housler and Mathews and said she would participate as well. Housler stated that Mathews was carrying a .9 millimeter handgun under his clothes at this party. On January 29, 1994, Housler arrived with Sulyn Ulangca at the trailer around nightfall. Mathews was in the trailer with Tween, Darwish, Kendra Corley, and Dana Ulangca (Sulyn's brother). Tween told Housler that "tonight is the night" for robbing the Taco Bell, and he asked Housler to get some ammunition. Housler left the trailer and visited someone called "Hippie Dude," who sold him a box of shotgun shells and box of .9 millimeter bullets. Housler returned to the trailer at around 11:00 p.m. Dana Ulangca was asleep, and Kendra Corley had left. Sulyn immediately pleaded with him not to participate in the robbery. While [Housler] argued with her, the others started

---

[2]The supreme court opinion mistakenly states that the Petitioner returned to Clarksville in October 1994.

to plan the robbery and killings. Housler did not hear the details. By the time Housler's argument with Sulyn ended, the group was ready to leave. Housler drove his white Tracer, and Darwish drove her red Tempo. Tween was wearing a dark-blue hooded jacket and blue jeans, and Mathews was wearing a black knee-length jacket. The group stopped at the Minit Mart for beer and cigarettes. On the ride to Taco Bell, Mathews told Tween to get the register, and he would take care of the safe. Tween had a .9 millimeter pistol, while Mathews seemed to have the shotgun--a twenty-four inch Mossberg pump--stuffed under his coat. However, during the drive, Mathews told Housler that Corley placed the guns in a trash can at the restaurant where they would be available to him. Housler had his .9 millimeter handgun.

[U]pon arriving at the Taco Bell, [Housler] pulled up to the drive-through window. Mathews exited the car and tapped on the window, which was opened by a heavy-set woman with brown hair. Mathews stated that he needed to get inside to retrieve his wallet or driver's license. During this time, Housler saw Darwish's car in the mall parking lot. Tween then told Housler to keep the car running and that if anyone pulled up to the restaurant to honk the horn twice and leave. Tween got out of the car and ran behind the dumpsters. Housler decided not to go inside because he was fighting with Sulyn. He pulled up parallel to the main double doors of the restaurant. Housler saw Mathews and the woman walk toward the counter area near the bathrooms. After about twenty minutes, he heard ten to fifteen loud pops from inside the building, which lasted for about two to three minutes. After the pops stopped, Housler heard a loud bang, which "sounded like a metal door being swung open[,]" and within seconds he saw Tween run from behind the Taco Bell to the dumpsters. Next, he heard a similar bang and then saw another person exit the Taco Bell and run in the direction of the dumpsters. He put the car in gear and drove, almost hitting an older model Chevelle with a Tennessee license plate starting "DFN." He stated that Darwish drove the getaway car with Tween and Mathews inside. Housler drove to the nearby Dingo Boot parking lot, where the group had previously agreed to meet. Darwish pulled up soon after with Mathews and Tween.

-4-

Mathews got out of Darwish's car, opened the trunk, and threw in the shotgun and a Taco Bell bag; Tween got out and threw in his pistol. Housler then asked Tween what happened. Tween said Mathews took all the employees in the back and "flipped out." Tween told Housler to leave, and Housler returned to the trailer. Tween and Darwish arrived at the trailer about thirty minutes later without Mathews. Housler asked where his cut of the money was, and Tween said that Mathews would bring it later. Tween also said that Mathews shot the victims in the head "gangster-style" to ensure that they were dead. Housler left the trailer an hour later, telling Tween to wait there for his cut of the money. Housler mentioned that Mathews said that he got [$1,500] from the robbery. Housler drove to Jennifer Ellis's house and stayed there until 6:00 p.m. that same day. He went back to the trailer and asked Tween for his money, but Tween said that Mathews had not returned. Housler left his car on the road where Jennifer Ellis lived because he thought it would be connected to the murders. He believed that police later impounded his car. Housler stated he did not see Mathews again until they met in jail.

Id. at 482-84.

Investigators contacted Sulyn Ulangca, who did not corroborate the Petitioner's statement. Id. at 484. When Ulangca tried to confront the Petitioner, he refused to see her and "confessed to implicating an innocent person." Id. As a result, prosecutors told the Petitioner that he had breached the proffer agreement and that they were revoking it. Id. The Petitioner was charged with four counts of felony murder, and the State filed a notice of intent to seek the death penalty. Id. Later, the State withdrew the notice of intent to seek the death penalty and filed a notice of intent to seek imprisonment for life without the possibility of parole. Id.

The Petitioner was tried for the murders in November 1997. Id. At the Petitioner's trial, the State's strategy was

(1) to establish [Housler's] guilt in committing the Taco Bell robbery and murders by using many of the same witnesses and much of the same evidence that the prosecution used at Mathews' trial and (2) to establish Housler's guilt in the same crimes by using his written statement, which placed him with

Mathews as a lookout on the night of the killings, and with the testimony of several corroborating witnesses.

Id. at 484. The Petitioner objected to the admission of his confession at trial on the basis that it was "substantially false." Id. However, the trial court ruled that the statement was admissible. Id. The statement was admitted into evidence, and the State established during the Petitioner's trial that "significant portions" of it were false. Id.

Our supreme court described the following relevant evidence presented at the Petitioner's trial:

> Michele Antaya testified that on January 29, 1994, at approximately 11:15 p.m., she stopped at the Taco Bell drive-through window. According to Antaya, she saw an African-American male walk from behind the Taco Bell dumpsters toward her car. She described him as around five feet ten inches tall, stocky, and with short hair shaved on the sides. She testified that he was wearing a dark jacket with a hood and dark pants. This description matched Mathews.
>
> Yowanda Maurizzio went through the Taco Bell drive-through at about 1:15 a.m. on January 30, 1994. She observed a black male speaking with a black female inside the restaurant. Only one other African-American male besides Mathews was employed at the restaurant, and he was not on duty the day of the murders.
>
> Frankie Sanford testified that he was at the Taco Bell drive-through about 1:30 a.m. on January 30. He said that he saw Mathews dressed in his Taco Bell uniform working inside the restaurant.
>
> Jacqueline Dickinson stopped at a traffic light in front of the Taco Bell around 2:40 a.m., looked into the restaurant, and saw a white male at the counter looking toward the Long John Silver's lot next door. According to Dickinson, the man was wearing a long green jacket with a big hood and a dark pair of jeans. She described the man as five feet nine inches to six feet tall, medium build, with short hair brown hair cut in a military style. She also saw in the Taco Bell parking lot a white car

-6-

"facing inward towards the building." The car was not in the same position as a white car owned by one of the victims that was parked there that night.

Damien Cromartie stopped at the Taco Bell around 3:00 a.m. He observed a few vehicles in the parking lot and a brown or burgundy sedan parked in the Two Rivers Mall parking lot behind the Taco Bell. When he pulled into the drive-through lane, he saw a large piece of cardboard in the window. On the cardboard he saw the silhouettes of two or three people moving around inside the restaurant.

Bill Hudspeth testified that, between 2:00 and 2:30 a.m. on January 30, 1994, he drove by the Taco Bell and saw a white male run diagonally from an area behind the restaurant to the front of his car and then toward a muffler shop across the street. Hudspeth described the male as between five feet nine inches and six feet tall, with short hair, and a stocky build. Hudspeth said another white male with short hair, a stocky build, and a bit taller than the other individual was standing near the muffler shop.

Mark Jolly testified that he was in the Shoney's parking lot across the street from the Taco Bell between 2:30 and 3:00 a.m. on January 30, 1994, when he heard two loud bangs and saw a man running from the back of the Taco Bell. According to Jolly, the man was a Puerto Rican or a light-skinned African-American male, wearing shorts, and carrying something rolled up in a brown bag in his left hand. After he saw the man, Jolly observed the lobby lights in the Taco Bell flicker on and off two or three times.

Allen Ceruti testified that he passed by the Taco Bell between 4:20 and 4:30 a.m. He observed an African-American male standing at the open back door.

Charlie Brown testified that Mathews and Housler were both at a party together at the trailer in Oak Grove, probably on January 21. During his testimony, Brown recanted a statement he made in November 1995, wherein he said that he heard

Mathews talking about robbing the place where he worked.

Melanie Darwish testified that she may have [loaned] her car to Housler on the night of the robbery and murders, although she was not sure. According to Darwish, she was at home in bed on that night. Darwish said that Mathews had been at a party at the trailer; however, she did not remember Housler being there.

Lopez Gaddes, a convicted drug trafficker, was in the Montgomery County Jail with Housler in 1994. Housler told Gaddes that he knew Mathews and that Housler, Charlie Brown, and Mathews had conversations about robbing the Taco Bell. Housler told him that the first conversation about the robbery took place at a party a week or two before the murders. Housler also told Gaddes that the group again talked about committing the robbery at the barracks. When Gaddes asked Housler if he was scared, Housler responded that he was not because Mathews acted as the trigger man.

Jason Carr testified that he was incarcerated with Housler in the Montgomery County Jail during March 1994. During a card game with Housler and Charlie Brown, one of the two men (he could not remember which) stated that Housler's car was used in the getaway of the Taco Bell murders.

Larry Underhill, another inmate, testified that Housler told him, while the two were in jail, that he killed the Taco Bell employees. Underhill said that Housler told him that the victims were shot execution-style. Housler also asked Underhill about the possibility of redemption for sin.

Christopher Ester, a convicted felon, frequently visited the trailer in Oak Grove. Ester testified that he saw Mathews at the trailer on January 29, 1994. Mathews talked about the robberies he had committed. According to Ester, Mathews and Housler had a conversation that night. Ester testified that Mathews left the trailer around 12:30 or 1:00 a.m. and that Housler left about 2:30 or 3:00 a.m. after he and Ulangca got into an argument. Housler was supposed to call and let the

group know his whereabouts, but he never did.

Orlando Gill also visited the trailer. He believed that he met Mathews the weekend before the murders, when Kendra Corley brought Mathews to the trailer. He observed Housler and Mathews conversing in the kitchen.

Hector Ortiz also saw Mathews at the trailer with Corley before the murders. He likewise observed Mathews and Housler conversing. Ortiz was at the trailer on the night of the murders, and he saw Housler and Ulangca there but not Mathews. When he left around 1:00 a.m., neither Housler nor Ulangca was present in the trailer. When he returned to the trailer around 2:30 or 3:00 a.m., the couple still was not there.

Kendra Corley testified that Mathews did not go to a party at the trailer on January 21, 1994, because he was working. Corley stated that she did bring Mathews to the trailer on Saturday, January 22, and they arrived between 9:30 and 10:00 p.m. Corley stated that she did not go to the trailer with Mathews on January 28. According to Corley, Mathews gave her [$255] in five-dollar bills just before his suicide attempt. Corley also identified the black jacket as belonging to Mathews.

James Bowen testified that Corley brought Mathews to the party a week before the murders. Bowen overheard Housler and Mathews discussing the robbery of Taco Bell. According to Bowen, Housler and Mathews argued over who would do the shooting and who would be the lookout. Bowen testified that Mathews stated they would rob Taco Bell because, since Mathews worked there, it would be easier for them. Bowen stated that he saw Housler and Ulangca go into the trailer's bedroom about 2:00 a.m. and that they were still there when he woke up.

Housler testified in his own defense. He denied any involvement in the robbery and murders. He asserted that his October 20 statement was wholly false and concocted from jailhouse rumors and newspaper reports. Housler claimed that in order to get out of jail he lied about knowing of Mathews'

-9-

involvement in the crimes. He also asserted an alibi defense, saying that he was with Sulyn the entire night of the murders.

At trial, Sulyn Ulangca now claimed that Housler was with her on the night of the murders. But she also admitted that she previously was unable to account for Housler's whereabouts on the night of the killings.

Id. at 485-87.

On November 21, 1997, the jury convicted the Petitioner of four counts of felony murder and sentenced him to life. Id. at 487. After a sentencing hearing, the trial court ordered that the Petitioner serve the life sentences consecutively. Id. The trial court denied the Petitioner's motion for a new trial, and this court and our supreme court affirmed his convictions. Id. at 487, 495.

In May 2007, the Petitioner timely filed a pro se petition for post-conviction relief, alleging, in pertinent part, that he received the ineffective assistance of counsel. The post-conviction court appointed counsel. On January 30, 2009, counsel filed a document titled "Amended Petition for Post-Conviction Relief and, Alternatively, Motion for Writ of Error Coram Nobis." In the amended petition for post-conviction relief, the Petitioner raised numerous claims of ineffective assistance of counsel in relation to the "proffer agreement" he made with the State on October 19, 1995, and the statements he gave about the crimes, particularly the "proffer statement" he gave on October 20, 1995. In the petition for writ of error coram nobis, the Petitioner alleged actual innocence based on newly discovered evidence. The State filed a motion to dismiss the petition for writ of error coram nobis on the basis that the Petitioner filed it outside the one-year statute of limitations. The post-conviction court denied the motion, concluding that due process required tolling the statute of limitations.

## II. Post-Conviction/Error Coram Nobis Evidentiary Hearing

The post-conviction court held an evidentiary hearing in December 2009. Relevant to the issues addressed in this opinion, the following evidence was presented at the hearing:

The Petitioner testified that in March 1994, the Civil Investigative Division (CID) arrested him for being absent from the Army without leave (AWOL). He said that while he was being detained, a "T.B.I. guy . . . [Agent] Puckett and somebody else" questioned him about the Grandpa's robbery and the Taco Bell murders. He said that he did not remember receiving Miranda warnings before the questioning and that he told them he did not know

Courtney Mathews. The agents continued to question him, and the Petitioner denied any involvement in the Grandpa's robbery or the Taco Bell crimes. On March 10, 1994, the Petitioner took a polygraph examination and failed the Grandpa's portion of the test. Eventually, he truthfully admitted to the officers that he had participated in the Grandpa's robbery. The Petitioner was moved to the Montgomery County Jail in Clarksville, his bond was set at $100,000, and pretrial counsel was appointed to represent him. The Petitioner admitted to pretrial counsel that he had committed the Grandpa's robbery. He said pretrial counsel told him that "there's really nothing I can do about that unless you know something about Taco Bell."

The Petitioner testified that information about the Taco Bell murders was on television and in the newspapers; that his girlfriend, Sulyn Ulangca, was pregnant; and that he wanted to get out of jail to help her. The Petitioner talked with a friend and fellow jail inmate, Charlie Brown, and made up a story. The Petitioner told pretrial counsel that he had information about the Taco Bell crimes, and pretrial counsel told him to write out the story. Pretrial counsel gave the story to the police. On March 21, 1994, the police talked with the Petitioner about the story. The Petitioner said he told them that prior to the Taco Bell crimes, he was at a "party trailer" in Oak Grove, Kentucky, and overheard Mathews and some other people talking about possibly committing a robbery. The Petitioner said he did not think the police would "buy" the story. Nevertheless, after he gave his March 21 statement, his bond was reduced to $10,000.

The Petitioner testified that in April 1994, he was still in jail when the police questioned him about a statement they had taken from an individual named Michael Miller. Miller had told the police that he met the Petitioner while they were teenagers and that he overheard the Petitioner and Brown talking about participating in the Taco Bell crimes. The Petitioner told the police that he had never met Miller as a teenager, that he only knew Miller from their time together in jail, and that Miller's statement was "all a lie." In September 1994, the Petitioner was still in jail when his bond was reduced to $1,000. The Petitioner finally managed to make bond and returned to Kentucky to live with his parents. He said he knew that he would have to go back to jail when the police figured out that his March 21 statement was not true.

The Petitioner testified that in October 1995, he learned that authorities wanted him to return to Clarksville. If he did not return, his bond would be revoked. The Petitioner returned to Clarksville on October 11 and met with pretrial counsel, but pretrial counsel did not prepare him for any interviews. The Petitioner and pretrial counsel went to the district attorney's office and met with prosecutors and police officers. Prosecutors asked him about his March 21, 1994 statement, and the Petitioner retold his story about overhearing Mathews planning the Taco Bell robbery. The Petitioner said that on October 19, 1995, he returned

to Clarksville for more questioning, and prosecutors told him they knew his March 21 statement had "some wrong stuff with it." The Petitioner acknowledged that someone showed him gory photographs of the Taco Bell victims, told him that whoever committed the murders was going to "fry," and told him that he "better tell the truth." The Petitioner told everyone in the room, including pretrial counsel, that his March 21 statement was not true. After that revelation, pretrial counsel never asked to speak with the Petitioner privately, never stopped the interview, and never advised the Petitioner. The Petitioner said that he repeatedly asked for the questioning to stop and that he told them he wanted to leave. He said he was allowed to take bathroom breaks. He asked to smoke outside but was told he had to smoke in the interview room. At some point during the interview, everyone took a break, and the Petitioner was left alone in the room with Agent Jeff Puckett of the Tennessee Bureau of Investigation (TBI). Puckett's demeanor became angry, and he questioned the Petitioner. After the break, everyone returned to the interview room, and the interview resumed. The Petitioner said he told them that he had "gass[ed] [Mathews] up," meaning that he had "egged [Mathews] on." Pretrial counsel pulled the Petitioner aside and told him that he had just incriminated himself in a conspiracy to commit first degree murder. The Petitioner did not understand how he had incriminated himself, and pretrial counsel did not explain it to him.

The Petitioner testified that the prosecutors also said he had implicated himself. The Petitioner said that the prosecutors were "looking for something," that he was "thinking . . . that it couldn't [get] no worse," and that he decided to make up more stories. At some point, pretrial counsel left with District Attorney General John Carney to talk about an agreement. When pretrial counsel returned, he had a written agreement and told the Petitioner that it was the best he could do for the Petitioner. The Petitioner said that the agreement required him to give a truthful statement and that it "also said that the State has to decide the truth, which I asked [pretrial counsel] about, because to me, that doesn't make any sense." Pretrial counsel did not explain the agreement to the Petitioner and never told him that if he lied, the State would be able to use his statement against him. If the Petitioner had known that the State could use his statement, he would not have signed the agreement. After the Petitioner signed the agreement, questioning resumed. The Petitioner said he changed his story frequently because he "would just follow their cues." After the interview, he went to a hotel for the night.

The Petitioner testified that the next day, October 20, he returned for another interrogation. The Petitioner said that Agent Puckett wrote down his statement and that his statement "was still basically that we were at the party and I gassed him up or something to that effect." At some point, pretrial counsel left the room, and Agent Puckett told everyone present that the Petitioner had claimed to have given Mathews the idea to kill the victims. The Petitioner told Agent Puckett that that was not true. The Petitioner was told that he had

-12-

to take a polygraph for the statement. The Petitioner said that he did not think he received <u>Miranda</u> warnings before he took the polygraph and that pretrial counsel was not present during the examination. He said that after he took the polygraph, he was told that "something wasn't right" and that he had to give another statement. The Petitioner said that he changed his story and that he "knew they were trying to get me, so I put almost everybody I knew in it." In his final statement, the Petitioner claimed Sulyn Ulangca had been with him at the Taco Bell during the crimes. He said he wanted the questioning to be over and that he tried to make the story "easy to prove it's a lie."

The Petitioner testified that Agent Puckett wrote out his final statement and that "some stuff was left out and some stuff was reworded." The Petitioner said that he signed the statement and that he did not think pretrial counsel "was there for any of this." The Petitioner said his final statement was "[c]ompletely different" from his previous statements and placed him at the scene of the crimes, which was "[c]ompletely false." After the Petitioner signed the statement, he was allowed to return to Kentucky but had a beeper for the police to contact him. In early November 1995, authorities "beeped" the Petitioner and told him to return to Clarksville. The Petitioner thought that the authorities had discovered his October 20 statement was a lie and that he was going to go to jail for committing the Grandpa's robbery. The Petitioner returned to Clarksville on November 7, 1995, and he and pretrial counsel went to the district attorney's office. Pretrial counsel told the Petitioner that the police wanted him to confront Sulyn Ulangca. The Petitioner was ashamed that he had falsely implicated Ulangca and refused to confront her. He also told pretrial counsel that the final statement he gave on October 20 was "all a lie." Pretrial counsel talked with the district attorney, returned to the Petitioner, and told him that if he did not confront Ulangca, he had breached the proffer agreement. The Petitioner told pretrial counsel that he would not confront Ulangca and asked pretrial counsel if he was under arrest. Pretrial counsel told him no, so the Petitioner tried to leave. He said that as he was "[g]oing down the steps," two police officers grabbed him and arrested him. The Petitioner thought he was being arrested for the Grandpa's robbery. He said that on the night of the Taco Bell robbery, he thought he was with Ulangca at his house or at the party trailer.

The Petitioner testified that after he was indicted for the Taco Bell murders, lead counsel and co-counsel became his new attorneys for trial. Investigators Larry Wallace, Ron Lax, and Glori Shettles worked on his case. Trial counsel did not consult with the Petitioner about trial strategy. After the Petitioner was convicted and sentenced, he learned that trial counsel had obtained a timeline for the Taco Bell robbery. The timeline, which they received before the Petitioner's trial, had been prepared by Mathews's investigators and showed that Mathews committed the crimes alone. The Petitioner's attorneys did not present the timeline at trial. The Petitioner said that when he learned about the timeline, he was angry. He said that he asked trial counsel why they had not introduced the timeline into evidence and that

they told him that "[t]hey didn't think they could get it in." The Petitioner said he did not know that Lax and Shettles had worked on Mathews's case.

On cross-examination, the Petitioner testified that he went to the party trailer frequently. At the time of the Grandpa's and Taco Bell robberies, the Petitioner was not working, but the Army was paying him, and he did not need money. He acknowledged that he participated in the Grandpa's robbery with Melanie Darwish and that he took the victim's wallet. He said that he did not remember being advised of his Miranda rights at the CID office. However, the State showed him a waiver of rights form, and he acknowledged that he signed the form on March 10, 1994. The Petitioner learned about the Taco Bell crimes from watching television, reading the newspaper, and hearing gossip in jail. Brown helped him concoct the statement he gave to the police on March 21, 1994.

The Petitioner acknowledged that he signed his proffer agreement with the State on October 19, 1995, and that the agreement said he was being charged with conspiracy to commit first degree murder. However, the Petitioner did not understand the charge. He said that he asked pretrial counsel about the charge, that pretrial counsel told him not to worry about it, and that he signed the proffer agreement because pretrial counsel told him to sign it. He acknowledged that Agent Puckett wrote his October 20 statement for him, that Agent Puckett read the statement to him, that he initialed every page of the statement, that he initialed changes to the statement, and that he signed it. Pretrial counsel was not present when Agent Puckett wrote the statement or the Petitioner signed it because pretrial counsel had left for the day. The Petitioner said that he did not realize falsely implicating someone in the Taco Bell crimes would breach the proffer agreement and that it should have been "painfully obvious" to authorities that his October 20 statement was not true. In addition to falsely accusing Sulyn Ulangca in the statement, the Petitioner also falsely accused Red Tween and Melanie Darwish. The Petitioner implicated Ulangca and Tween because he was always with them, and they would have known that he did not participate in the Taco Bell crimes.

The Petitioner testified that after he refused to confront Ulangca, he decided to leave the building. Pretrial counsel had told him that he was not under arrest, and the Petitioner "went quick." As he was going down some steps, officers going up the steps grabbed him. They handcuffed him, and pretrial counsel "walked out." The Petitioner did not ask for new counsel after his arrest, but the trial court appointed lead counsel and co-counsel to represent him. The Petitioner acknowledged that they discussed the charges and the facts of the case with him. The Petitioner said that Mathews's timeline proved his October 20 story was fiction because his name was not mentioned in the timeline. The Petitioner acknowledged that he never claimed in his October 20 statement that he went inside the Taco Bell, which could have explained why he was not mentioned in the timeline.

On redirect examination, the Petitioner testified that although he signed a waiver of rights form on March 10, 1994, he did not remember signing any other waiver of rights forms. When the Petitioner gave his statement on October 20, 1995, he did not feel free to leave. On recross examination, the Petitioner acknowledged that he gave his October 20 statement while pretrial counsel was not present. He said he gave the statement without counsel because he did not know he could refuse to give the statement.

John W. Carney, Jr., testified that he used to be the Deputy Director of the TBI. He was then in private practice briefly with several other attorneys, including pretrial counsel. In 1993, General Carney became the District Attorney General for the Nineteenth Judicial District, and in 1994, he assigned Assistant District Attorney General Steve Garrett to be the lead attorney prosecuting the Taco Bell murder case. The TBI assigned Agent Jeff Puckett to the case, and Agent Puckett kept General Carney informed about the investigation. In March 1994, General Carney learned that the Petitioner was a suspect in the Grandpa's robbery and that he was in military custody for being AWOL. General Carney said that the Petitioner's name "came up along with Courtney Mathews' name and along with a string of names of people that came up in reference to a party trailer that was owned by Kevin Tween." Agent Puckett interviewed the Petitioner on March 7 and 10, 1994. General Carney stated that in the Petitioner's March 7 statement, the Petitioner was "talking about the Taco Bell crimes." However, the Petitioner denied any involvement in the Taco Bell or Grandpa's robberies.

General Carney testified that the trial court appointed pretrial counsel to represent the Petitioner in the Grandpa's case and that pretrial counsel contacted the district attorney's office. General Carney said that according to pretrial counsel, the Petitioner "very likely" had information about the Taco Bell murders. While the Petitioner was being held in jail for the Grandpa's robbery, General Carney and General Garrett talked with pretrial counsel about lowering the Petitioner's bond in exchange for truthful information about the Taco Bell crimes. On March 21, 1994, the Petitioner gave a statement to Agent Puckett in which he claimed to have heard Mathews talking about planning to rob Mathews's place of employment. About March 23, 1994, Michael Miller gave a statement to police implicating the Petitioner in the Taco Bell murders. The Petitioner was questioned about Miller's statement and denied any involvement. Eventually, the Petitioner's bond was reduced to $1,000, and he got out of jail and returned to his home in Kentucky.

General Carney testified that while the Petitioner was on bond, the police tried to corroborate his statements. General Carney said that in October 1995, the Petitioner was recalled to Clarksville to explain "some inconsistencies." General Carney said that although the Petitioner's having to return to Clarksville was not a written condition of his bond, everyone "understood" that the Petitioner had to return as requested. General Carney and

members of his staff met with the Petitioner and pretrial counsel on October 11. During the interview, the Petitioner implicated himself in the planning of the Taco Bell crimes. Although someone tried to show photographs of the Taco Bell victims to the Petitioner, he did not want to look at them. General Carney never heard anyone use the word "fry" during the interview. He said the Petitioner probably was not given Miranda warnings prior to the interview because he was not in custody and his attorney was present.

General Carney testified that he met with the Petitioner and pretrial counsel again on October 19. Agent Puckett also was present and took notes. During a break in the interview, Agent Puckett was left alone with the Petitioner in the interview room and spoke with the Petitioner privately. Agent Puckett later approached General Carney and told him that the Petitioner had stated, "I feel like I gassed [Mathews] up to kill these people." The Petitioner also told Agent Puckett that he had offered to go with Mathews if Mathews "grew the balls enough to go down there and do this robbery." Agent Carney explained, "[T]hat was a critical turning point because now [the Petitioner was] implicating himself deeper into . . . a conspiracy." Post-conviction counsel asked General Carney, "[I]f someone merely encourages someone else to commit a crime, gases them up, is that a crime?" General Carney answered, "Maybe in or of itself, it might not be, but if you aid or contribute to that gassing up and take some overt act in its part, that would be." General Carney stated that pretrial counsel was frustrated when he learned about the Petitioner's comments to Agent Puckett but that pretrial counsel did not object to Agent Puckett's questioning the Petitioner. General Carney said he did not think the Petitioner received Miranda warnings prior to the October 19 interview because the Petitioner was not in custody and his attorney was present.

General Carney testified that after the Petitioner's comments to Agent Puckett, he and members of his staff, including Steve Garrett, took a lunch break and began talking about how to draft "a proffer agreement, you know, use immunity agreement, contract, whatever you want to call it." General Carney said that he was "somewhat familiar" with proffer agreements from having worked previously with the United States Attorney's Office while he was employed by the TBI. He obtained a copy of a federal proffer agreement, and he and General Garrett used it as a model to draft their own agreement. He explained, "We would take out things that didn't involve State government . . . but we used a large percentage of it after going over it numerous times."

General Carney testified that according to the agreement, the Petitioner's aggravated robbery charge for the Grandpa's crime would be reduced to robbery, and the Petitioner would receive a four-year sentence. The proffer agreement also provided that the Petitioner would be charged with conspiracy to commit first degree murder for the Taco Bell crimes and would receive a fifteen-year sentence to be served concurrently with the four-year sentence. According to the proffer agreement, the Petitioner would waive his right to have

a sentencing hearing within thirty days of entering his pleas. General Carney explained that the Petitioner "would enter pleas and have those charges . . . hanging over him until the end of all the cases and then at the end, he would then go to sentencing." The agreement gave the State "unilateral" and "sole" discretion to determine the value of the Petitioner's information. General Carney explained that the Petitioner was to give a "proffer statement"; that the proffer agreement gave his office the authority to evaluate the proffer statement and determine whether it was truthful, reliable, and credible; and that his office would "evaluate it and analyze it in good faith." If the Petitioner breached the proffer agreement by giving untruthful information, then the State could pursue criminal charges against him and use his proffer statement against him. General Carney reviewed the proffer agreement with pretrial counsel, and pretrial counsel and the Petitioner signed it. General Carney did not talk with the Petitioner about the proffer agreement until the Petitioner breached it.

General Carney testified that on October 20, 1995, the Petitioner gave his proffer statement. The statement was reduced to writing by Agent Puckett. In the statement, the Petitioner said he drove Mathews, Tween, and Sulyn Ulangca to Taco Bell on the night of the murders. General Carney said that the proffer statement could have been "extremely valuable" in the prosecution of Mathews and that it "had potential to open up the investigation further than just [the Petitioner] and Mathews." Pretrial counsel was present when the Petitioner started giving the proffer statement, but General Carney did not know if pretrial counsel remained for the entire statement. The Petitioner did not receive Miranda warnings prior to giving the proffer statement because he was not in custody and pretrial counsel was present.

General Carney testified that after the Petitioner gave his proffer statement, agents interviewed Sulyn Ulangca in North Carolina and gave her a polygraph. She denied being involved in the Taco Bell robbery and volunteered to return to Tennessee to confront the Petitioner. General Carney spoke with Ulangca and believed she was telling the truth about not being involved in the crimes. General Carney called the Petitioner back to Clarksville to "discuss some inconsistencies in his statement," ask him why he had implicated Ulangca, and have Ulangca confront him. The Petitioner voluntarily returned to Clarksville, and General Carney and General Garrett met with him and pretrial counsel. When the Petitioner refused to speak with Ulangca, pretrial counsel asked to talk with the Petitioner privately. The Petitioner told pretrial counsel that everything in his proffer statement had been true except for Ulangca's involvement in the crimes. When pretrial counsel told General Carney what the Petitioner had revealed, General Carney informed pretrial counsel that the Petitioner had breached the agreement by implicating an innocent person in the murders. General Carney said that the Petitioner also breached the agreement by lying in the proffer statement about where he got the nine millimeter handgun. However, "the most egregious" breach was implicating Ulangca, and pretrial counsel did not protest General Carney's declaration of the

-17-

breach. After General Carney announced the breach, he went to check on Ulangca and heard a commotion. General Carney said that the Petitioner had "bolted," that police officers apprehended him before he could run out the front door, and that he was arrested. After the arrest, General Carney disqualified himself and his staff from prosecuting the Petitioner because General Carney thought he had become a witness in the case.

On cross-examination, General Carney testified that prior to this case, he had never worked on a case in which four people were killed at one time. He described the case as "significant." He acknowledged that Agent Puckett had a reputation for being honest and following procedures and said that if a person was not in custody, Miranda warnings were not required "unless the person started implicating himself in a crime." The Petitioner received Miranda warnings prior to his first interview in March 1994. He was advised of his rights again and executed a written waiver for the March 1994 polygraph. During the Petitioner's interviews with authorities, regular breaks were taken. General Carney said that he did not know if the Petitioner smoked but that nothing should have given the Petitioner the impression that the Petitioner was not free to leave. The Petitioner could have stopped answering questions at any time. The proffer agreement provided that the Petitioner would be charged with conspiracy to commit first degree murder as opposed to first degree murder. He also acknowledged that the proffer agreement was part of plea negotiations, stating, "Yes. It was taken in that context, yes." After signing the proffer agreement, the Petitioner remained out of jail on bond. General Carney said that the Petitioner was arrested on November 7, 1995, because "he was fleeing the office" and that the Petitioner's bond was revoked that same day. On redirect examination, General Carney testified that the Petitioner was taken into custody "after he bolted."

Steve Garrett testified that he was an assistant district attorney in Clarksville at the time of the post-conviction evidentiary hearing and at the time of the Taco Bell crimes. In 1994, his supervisor was District Attorney General John Carney. On the night of January 30, 1994, General Garrett learned about the Taco Bell murders and went to the scene. Courtney Mathews was arrested shortly after the crimes, and General Garrett became the lead prosecutor in the case. General Garrett said that in March 1994, the State's theory of the case was that Mathews was the "sole shooter." He said, though, that rumors about the Petitioner were "bubbling" and that the Petitioner had been associated with the "party trailer." About two weeks after the Taco Bell robbery, General Garrett learned about the Grandpa's robbery. He also learned that the Petitioner had been arrested for the Grandpa's robbery, that Agents Jeff Puckett and George Elliot had questioned the Petitioner, and that the Petitioner had taken a polygraph. The Petitioner was charged with aggravated robbery for his participation in the Grandpa's robbery, and pretrial counsel became his attorney.

General Garrett testified that in March or April 1994, he met with the Petitioner and

pretrial counsel. General Garrett said he was interested in the Petitioner because the Petitioner was "a possible witness to premeditation conversations" with Mathews. General Garrett and pretrial counsel discussed reducing the Petitioner's bond for the Grandpa's robbery in exchange for a statement from the Petitioner about the Taco Bell crimes, and the Petitioner gave his first statement on March 21, 1994. General Garrett said that in the statement, the Petitioner did not say he had participated in the Taco Bell crimes but may have "implicated himself in the planning of it." In March or April 1994, General Garrett spoke with Michael Miller, who claimed that the Petitioner had participated in the Taco Bell crimes. The Petitioner was confronted with Miller's statement, but the Petitioner denied even knowing Miller. In September 1994, the Petitioner was released from jail on bond and went to Kentucky. Meanwhile, General Garrett prepared for Mathews's trial. Ron Lax, a private investigator, was working for Mathews.

General Garrett testified that in October 1995, he asked the Petitioner to return to Clarksville so he could talk with the Petitioner about what the Petitioner knew about the Taco Bell robbery and "try to tie up some of these loose ends." General Garrett did not remember the Petitioner's having to return to Clarksville as a condition of his bond. About 3:30 p.m. on October 11, 1995, General Garrett met with the Petitioner and pretrial counsel at the district attorney's office. District Attorney General Carney, other prosecutors, and police officers also were present. General Garrett thought the Petitioner was advised of his Miranda rights, but he did not remember the Petitioner's signing a waiver of rights form. He said that he did not remember anyone accusing the Petitioner of being involved in the Taco Bell crimes but that he remembered "some intense, profane questioning about . . . various contradictions or inconsistencies that we had on previous statements." Pretrial counsel did not object during any of the questioning, and the Petitioner took several breaks so he could talk with pretrial counsel. General Garrett said that at some point during the interview, the Petitioner said, "I told [Mathews] that he was a little bitch if he didn't go down there, and if he grew the balls to go I would go." General Garrett described the Petitioner's comment as "riveting" and the "most graphic statement of . . . anything that he had said." The Petitioner also may have said during the October 11 interview that he "gassed [Mathews] up." However, the Petitioner maintained that he had not been at the Taco Bell at the time of the crimes. General Garrett acknowledged that during the interview, the Petitioner was shown crime scene photographs and that the Petitioner did not want to look at them. The interview ended about 7:00 p.m. when the Petitioner decided that he wanted to go home to Kentucky and talk with his mother.

General Garrett testified that based on what the Petitioner had said during the October 11 interview, he began thinking about drafting a "proffer agreement" that would charge the Petitioner with conspiracy to commit first degree murder. On the morning of October 19, 1995, the Petitioner returned to the district attorney's office and gave another oral statement.

In the statement, the Petitioner claimed that he was at the Taco Bell during the crimes and that he served as Mathews's lookout. General Garrett, who had been working on the proffer agreement for one or two days, gave it to pretrial counsel to discuss with the Petitioner. Pursuant to the agreement, the Petitioner had to tell the State what he knew about the Taco Bell robbery and describe his involvement. In return for his information, the Petitioner would plead guilty to conspiracy to commit first degree murder. He also would plead guilty to robbery, instead of aggravated robbery, for the Grandpa's crime. Pursuant to the agreement, the Petitioner would be sentenced as a Range I, standard offender to concurrent sentences of fifteen years for the conspiracy conviction and four years for the robbery conviction. The trial court never accepted the agreement pursuant to Rule 11, Tennessee Rules of Criminal Procedure.

General Garrett testified that the next day, October 20, the Petitioner and pretrial counsel returned to the district attorney's office for another interview. General Garrett, Agent Puckett, and General Carney were present, and Agent Puckett wrote a report of the interview. According to the report, the Petitioner did not say during the interview that he was with Mathews at the Taco Bell. However, the report showed that Agent Puckett had an ex parte communication with the Petitioner in which the Petitioner claimed he gave Mathews the idea to kill the Taco Bell employees. The Petitioner wanted to take a polygraph, and a polygraph examination was administered to him after his interview. General Garrett said that after the Petitioner took the polygraph, he gave a "proffer agreement statement." The proffer statement, written by Agent Puckett, did not indicate that pretrial counsel was present when the Petitioner gave it. General Garrett said the Petitioner's written proffer statement was "compelling evidence" and described "multiple participants." Specifically, the Petitioner said in the proffer statement that he, Sulyn Ulangca, Red Tween, and Melanie Darwish participated in the Taco Bell crimes with Mathews. The Petitioner signed the proffer statement.

General Garrett testified that after the Petitioner gave the proffer statement, detectives began trying to corroborate it. He said Tween and Darwish were interviewed but "consistently maintained that they were not involved, and did not give any incriminating statements to us." On November 7, 1995, the Petitioner returned to Clarksville and was told he had to confront Sulyn Ulangca. The Petitioner refused. General Garrett said that the Petitioner met with pretrial counsel and that pretrial counsel "came back and he . . . offered up something . . . what was opposite of what Housler had said either on the 11th, the 19th or the 20th." At that point, General Carney informed pretrial counsel that the Petitioner had breached the proffer agreement, and pretrial counsel never objected or challenged the State's declaration of a breach. General Garrett said that, later, he heard "somebody running upstairs, [and] next thing I knew they had [the Petitioner], I think, in handcuffs."

-20-

On cross-examination, General Garrett testified that although the State thought Mathews was the shooter, there was evidence of other participants. In March or April 1994, the Petitioner claimed that Sulyn Ulangca could provide an alibi for him. However, police officers talked with her, and she could not provide an alibi for the Petitioner. General Garrett said that when the Petitioner learned Ulangca could not provide an alibi for him, the Petitioner made Ulangca "at least a witness" to the crimes. General Garret said that pursuant to the proffer agreement, the proffer statement could not be used against the Petitioner if he testified truthfully. However, if the Petitioner failed to testify truthfully, the State could use the statement. If the Petitioner breached the proffer agreement, the State could prosecute him for the Taco Bell crimes and use the statement. Between October 20 and November 7, 1995, TBI agents tried to corroborate the Petitioner's proffer statement. The Petitioner had claimed in his statement that he and Tween went into a convenience store while en route to the Taco Bell. However, the convenience store clerk, who knew the Petitioner and Tween, adamantly denied that they came into the store on the night of the crimes. Tween and Darwish were interviewed and took polygraphs. Agents also traveled to North Carolina and interviewed Ulangca. Ulangca took a polygraph and passed it.

General Garrett testified that on November 7, 1995, he told the Petitioner and pretrial counsel that Ulungca was in the building and that the Petitioner had to confront her. Pretrial counsel spoke with the Petitioner privately and told General Garrett and General Carney that the Petitioner "now wants to say . . . that he and Ulangca were not down there." General Garrett said that once again, the Petitioner had been "caught in a lie" and that General Carney told the Petitioner that the Petitioner had breached the proffer agreement.

Agent Jeff Puckett, the Deputy Director of the TBI, testified that in January 1994, he was a TBI special agent and one of the lead investigators in the Taco Bell crimes. He said that in February 1994, the Petitioner was "just one of the many names that were mentioned in regards to a party at a trailer in Oak Grove, Kentucky where Courtney Mathews had attended." Mathews was a suspect in the crimes and already had been arrested. Police officers interviewed people who had attended the party, including the Petitioner, Red Tween, Sulyn Ulangca, and Melanie Darwish. From the interviews, officers learned that some of the party attendees had overheard a conversation in which Mathews talked about robbing the Taco Bell. Agent Puckett acknowledged that he heard "a mixture of stories."

Agent Puckett testified that his first interview with the Petitioner occurred on March 7, 1994, at the CID office at Fort Campbell. He gave the Petitioner Miranda warnings, and they talked mainly about the Grandpa's robbery. However, Agent Puckett's primary objective in speaking with the Petitioner was to get information about the Taco Bell robbery. The Petitioner thought that on the night of January 21, 1994, the date of the trailer party, he was at home in Clarksville with Ulangca. He said that if he was at the party, he did not

remember meeting Mathews. The Petitioner claimed that on the night of the Taco Bell crimes, he was at Tween's trailer with friends. Although the Petitioner did not implicate himself in the Taco Bell crimes, Agent Puckett thought the Petitioner could have been involved in the planning of the robbery. Two or three days after the interview, the Petitioner waived his rights and took a polygraph in which he was questioned about both robberies. The Petitioner denied involvement, and the polygraph showed that the Petitioner was being deceptive. At some point, the Petitioner confessed to robbing Grandpa's and was taken to the Montgomery County Jail.

Agent Puckett testified that he interviewed the Petitioner again on March 21, 1994, and questioned him about his "involvement in the planning or the knowledge that a robbery was going to happen at Taco Bell." Pretrial counsel was present during the interview. The Petitioner told Agent Puckett that he saw Mathews at the party trailer on January 21, 1994, but that he did not see Mathews again until they were both in jail after the Taco Bell crimes. Agent Puckett also interviewed Michael Miller. Miller claimed that he was the Petitioner's childhood friend and that the Petitioner had admitted some involvement in the Taco Bell robbery. In July 1995, Agent Puckett interviewed Sulyn Ulangca. Ulangca did not remember if she was with the Petitioner on the night of the Taco Bell crimes.

Agent Puckett testified that he met with the Petitioner several times in October 1995. Agent Puckett did not remember the Petitioner's saying during one of the interviews that the Petitioner wanted the interview to end so he could go home. Agent Puckett did not show photographs of the victims to the Petitioner, but someone else may have done so. During one of the October interviews, the Petitioner said he "'gassed up'" Mathews, meaning he encouraged Mathews to commit the crimes. Agent Puckett stated, "[T]hat's what triggered the proffer agreement." On the morning of October 20, 1995, Agent Puckett interviewed the Petitioner and took notes. General Garrett, General Carney, and pretrial counsel also were present. Agent Puckett acknowledged that the Petitioner made some untrue statements during the interview. For example, the Petitioner claimed that he had been released from jail on March 10, 1994, when the Petitioner had not been released from jail until September 1994. At some point during the interview, everyone took a break, and Agent Puckett was left alone with the Petitioner. Agent Puckett told the Petitioner that he wanted the truth, and the Petitioner responded that "'he [was] the one that put the idea in [Mathews's] mind to leave no witnesses or kill the witnesses.'" Agent Puckett said that the Petitioner "had been mirandized a couple of times prior to that and had [an] attorney" but that he did not give Miranda warnings to the Petitioner prior to his speaking with the Petitioner alone. Agent Puckett told General Carney about the Petitioner's admission.

Agent Puckett testified that the Petitioner took a polygraph on October 20 and signed a statement saying that he was taking the polygraph voluntarily. The polygraph questions

asked if the Petitioner was inside the Taco Bell at the time of the homicides and if he fired a gun inside the restaurant. The Petitioner answered no. The results of the polygraph were inconclusive, meaning the Petitioner did not pass or fail. Sometime after the polygraph, the Petitioner gave a written statement. Agent Puckett wrote out the statement for the Petitioner and did not give him Miranda warnings prior to taking the statement. Pretrial counsel was not present when Agent Puckett wrote out the Petitioner's statement. However, Agent Puckett said he thought pretrial counsel was present when the statement was read back to the Petitioner and the Petitioner signed the statement. Agent Puckett said that from March 1994 to October 1995, the Petitioner's information about the Taco Bell crimes "evolved." After the Petitioner gave his written statement on October 20, Sulyn Ulangca took a polygraph and passed. Agent Puckett did not think she was involved in the crimes. Agent Puckett said that on November 7, 1995, Ulangca was brought to Tennessee to confront the Petitioner and that General Carney and his staff confronted the Petitioner about some "discrepancies."

On cross-examination, Agent Puckett testified that after he wrote out the Petitioner's October 20 statement, the Petitioner read it and initialed every page. Agent Puckett made corrections to the statement, and the Petitioner initialed the corrections. The Petitioner seemed to understand what he was saying and never seemed confused.

Pretrial counsel, who became a judge in 2004, testified that in 1993, he practiced law in the same office as John Carney. He said they were not partners but had "an association held out as a partnership" for about six months. By the time of the Taco Bell robbery, Carney had become the District Attorney General for the Nineteenth Judicial District. In March 1994, pretrial counsel was appointed to represent the Petitioner. Prior to the appointment, his practice of criminal law had not been very extensive. He may have handled one or two felony trials but had not participated in any murder trials. After the Petitioner was arrested for the Grandpa's robbery, pretrial counsel met with him in the Montgomery County Jail. The Petitioner had been charged with aggravated robbery in that case, and pretrial counsel asked him about the Taco Bell crimes. The Petitioner asked why everyone wanted to talk about Taco Bell and claimed he did not know anything about the Taco Bell robbery. Pretrial counsel described the Petitioner as "very animated" and "stressed out." At some point, the Petitioner telephoned pretrial counsel and asked to talk with him. On March 21, 1994, the Petitioner gave a statement to authorities in which he said he was at a party trailer in Oak Grove, Kentucky, and overheard Courtney Mathews say that Mathews was going to rob the place where Mathews worked and leave no witnesses. Pretrial counsel was present when the Petitioner gave the March 21 statement.

Pretrial counsel testified that in September 1994, the Petitioner's bond was reduced, and he was released from jail. In October 1995, General Steve Garrett asked pretrial counsel to have the Petitioner return to Clarksville. Pretrial counsel spoke with the Petitioner but did

not remember telling the Petitioner or his mother that the Petitioner's bond would be revoked if he did not return to Clarksville. Pretrial counsel also did not remember if he communicated with the Petitioner from September 1994 to October 1995 or if he worked on the Petitioner's case during that time. When the Petitioner returned to Clarksville in October 1995, pretrial counsel told him not to volunteer any information and that the Petitioner should talk with him first about any new information. He and the Petitioner met with police officers and prosecutors at the district attorney's office. After the interview, the Petitioner returned to Kentucky.

Pretrial counsel testified that the Petitioner returned to Clarksville on October 19, 1995, and met again with prosecutors and police at the district attorney's office. Pretrial counsel said that he did not recall Agent Puckett's being alone with the Petitioner and that he "would have been pretty darn upset about it." During the Petitioner's October 19 interview, his story changed. Pretrial counsel said the Petitioner "volunteered facts that made him a participant in the planning of the Taco Bell robbery." Pretrial counsel became upset with the Petitioner because the Petitioner's information was enough to convict him of conspiracy to commit first degree murder. Pretrial counsel stopped the interview, "ran everybody out of the room," and told the Petitioner that he had just implicated himself. After the Petitioner made the incriminating statement, pretrial counsel began "proffer negotiations" with General Garrett.

Pretrial counsel testified that according to notes he took about the proffer agreement, the Petitioner had to give "truthful and complete statements" and could not be the shooter in the Taco Bell murders. He said that if the Petitioner turned out to be the shooter, the State would not be "willing to deal with him." The State drafted the proffer agreement, and pretrial counsel went over every sentence with the Petitioner. The Petitioner's telling the truth was a term of the agreement. Pretrial counsel acknowledged that according to the agreement, any information given by the Petitioner would not be used against him in any criminal proceeding, except in a prosecution for perjury or giving a false statement, as long as he did not violate the agreement's terms. Post-conviction counsel asked pretrial counsel, "[H]ow does [that] make any sense?" Pretrial counsel answered, "Don't know." Pretrial counsel said he told the Petitioner that "if you are lying about this, they can use this against you." Pretrial counsel said he was concerned about General Carney's unilateral ability to determine a breach of the agreement and that he discussed his concern with the Petitioner. He said he told the Petitioner that the Petitioner "would have to tell the truth, and if [the Petitioner] did, we would be fine." He said that if the Petitioner materially breached the agreement, then "there would be litigation to follow and ultimately a Court." He said that he recommended that the Petitioner sign the proffer agreement and that he had no doubt the Petitioner understood the agreement.

Pretrial counsel testified that on October 20, 1995, Agent Puckett wrote out the Petitioner's statement from the previous day. Pretrial counsel said he did not stay for the entire statement because "it was to be consistent with the very long and extremely detailed statement [the Petitioner] had given the night before, pursuant to the proffer." He said that he was unaware of the Petitioner's taking a polygraph on October 20 and that he did not approve the Petitioner's taking the polygraph. On November 7, 1995, the Petitioner returned to the district attorney's office. General Carney wanted him to confront Sulyn Ulangca, but he refused. The Petitioner asked to speak with Ulangca privately, but he was not allowed to do so. Pretrial counsel said he told General Carney that the Petitioner would not confront Ulangca and that the Petitioner's story "may be different in regard to whether Sulyn and/or [the Petitioner] were present on the [Taco Bell] property during [the crimes]." Pretrial counsel said that prosecutors "had an expression of disbelief as well as frustration," that they believed Ulangca's claim of innocence, and that they announced the Petitioner had breached the proffer agreement. Pretrial counsel said that after prosecutors announced the breach, a scuffle occurred, the Petitioner was apprehended, and the Petitioner was "whisked away." Pretrial counsel did not know if he talked with the Petitioner after November 7, 1995, and he withdrew from the Petitioner's case on January 19, 1996. The next time he saw the Petitioner was at the Petitioner's suppression hearing in April 1997.

On cross-examination, pretrial counsel testified that he did not make any promises to the Petitioner and that he did not remember the Petitioner's being dissatisfied with his representation. He said he allowed the Petitioner to speak with prosecutors because the Petitioner had convinced him that nothing would implicate the Petitioner in the Taco Bell crimes. He said that he hoped to get "time served" for the Petitioner in the Grandpa's robbery and that he did not learn about the Petitioner's participation in the Taco Bell robbery until the October 19, 1995 interview. He said that if the Petitioner had revealed that information prior to the interview, he would not have allowed the Petitioner to speak with authorities. The Petitioner knew he did not have to speak with them. Regarding Miranda warnings, pretrial counsel stated that he was "certain that there was a waiver in connection[] with some of this." According to the proffer agreement, the Petitioner could not falsely implicate anyone in the Taco Bell crimes. The State asked pretrial counsel if he thought he represented the Petitioner in a competent manner, and he answered, "To the extent that I could with him changing like a chameleon, yes."

Co-counsel at trial testified that she graduated from law school in 1994, passed the bar exam in April 1995, and was appointed to represent the Petitioner in December 1995. She was "second chair" to lead counsel. Attorney Larry Wallace[3] was appointed to assist co-counsel and lead counsel. Wallace's job was to ensure that the defense received all discovery

---

[3]The Petitioner does not allege that Wallace was ineffective.

from the State, particularly General Garrett and Helen Young in the district attorney's office. Co-counsel identified a document labeled "'Agent's Note'" in which someone wrote that the Petitioner was not suspected to have participated in the Taco Bell crimes. Co-counsel said she learned about the document within the past year, and she acknowledged that she would have used the document at the Petitioner's trial. She also identified a letter written by Larry Underhill, who testified against the Petitioner at the Petitioner's trial. Underhill sent the letter to General Gus Radford, the prosecutor in the Petitioner's case, on October 15, 1997, and asked that certain promises be fulfilled in exchange for his testimony. Co-counsel said she did not know about the letter before the Petitioner's trial and could have used it to impeach Underhill.

Co-counsel testified that shortly after she and lead counsel were appointed to the Petitioner's case, they met with Courtney Mathews's lawyers, Jim Simmons and Skip Gant. She said Simmons and Gant "had requested that we meet with them and the purpose of it was to inform us that we were representing an innocent man." Simmons and Gant gave co-counsel and lead counsel access to evidence in Mathews's case, and co-counsel looked through file boxes and copied documents. Simmons and Gant also provided lead counsel and co-counsel with a timeline to help them with their investigation. Co-counsel said the timeline had been prepared by "Ron Lax and his team," the investigators from Inquisitor, Inc., who had worked on Mathews's case. She said the timeline started days before the robbery and showed "what [Mathews] was doing days before the murders were committed, what he was doing while the murders were committed, and what happened after the murders were committed." However, parts of the timeline had been redacted. Later, Simmons gave co-counsel unrestricted access to a file room, and co-counsel found an unredacted copy of the timeline. She said the unredacted timeline "explained what Courtney [Mathews] did, exactly who he killed, how he killed them, what he was doing before he killed them, what he did after he killed the people at Taco Bell." She stated that the unredacted timeline was "vital" to the Petitioner's defense, that it showed he was innocent, and that she made a copy of it. Co-counsel showed the unredacted timeline to lead counsel, but they did not show it to the Petitioner or Wallace. She said that Simmons had given her permission to copy anything in the file room but that she and lead counsel did not use the unredacted timeline at the Petitioner's trial because they thought it was "privileged."

Co-counsel testified that at some point, Glori Shettles, an investigator from Inquisitor, Inc., began helping the defense with the Petitioner's case because co-counsel and lead counsel were having difficulty locating and interviewing witnesses. Shettles also was appointed to help with mitigation evidence for the Petitioner. Although Shettles had worked on Mathews's case, co-counsel never considered Shettles's work for the Petitioner to be a conflict of interest. In a letter Shettles faxed to lead counsel and co-counsel on August 13, 1997, Shettles said Mathews and the Petitioner had denied ever meeting each other. Co-

counsel prepared an affidavit for Mathews to sign, stating that the Petitioner was not involved in the Taco Bell crimes. Jim Simmons presented the affidavit to Mathews, but Mathews refused to sign it.

On cross-examination, co-counsel testified that pretrial counsel testified at the Petitioner's motion to suppress hearing. The Petitioner waived his attorney/client privilege at the hearing in order to introduce pretrial counsel's time sheets into evidence and show that pretrial counsel did not spend much time with him. Co-counsel said that she met with the Petitioner less than ten times before trial and that she and lead counsel consulted with him "[a] little." The Petitioner testified on his own behalf at trial, but co-counsel did not force him to testify. The defense's theory was that the Petitioner was innocent and gave a false confession. Co-counsel consulted the unredacted timeline before the Petitioner's trial to help her organize the Petitioner's case. She described the unredacted timeline as "explosive" and said it contained entries for interviews in which Mathews told his investigators how the Taco Bell murders were committed. She said that she hid the timeline from the Petitioner, that "I should have used everything in that [timeline] at trial," and that she did not know why she and lead counsel did not use the timeline. When asked if her representation of the Petitioner was deficient, co-counsel said, "Absolutely." She also said she was "[c]ompletely incompetent." Co-counsel said that, in her view, Simmons and Gant waived their attorney/client privilege with Mathews and that they did so because they knew the Petitioner was innocent. She said that she and lead counsel should have had Simmons, Gant, Lax, and Shettles testify at trial and that she thought the jury convicted the Petitioner because the jury did not believe the State would put an innocent man through a trial. Co-counsel did not remember the Petitioner's expressing any dissatisfaction with her representation.

Ronald L. Lax, the owner of Inquisitor, Inc., testified that he had been a private investigator since 1971. In 1996 and 1997, approximately thirteen employees, including Glori Shettles, worked for Lax's company. Lax said that clients hired Inquisitor, Inc., for its civil and criminal investigative services and that the company was appointed to assist Courtney Mathews's defense team. On April 28, 1994, Lax interviewed Mathews. During the interview, Mathews described how he committed the Taco Bell crimes alone. Lax interviewed Mathews more than once, and Mathews never mentioned the Petitioner's being a participant in crimes. Lax said that after the Petitioner provided information about the Taco Bell robbery to authorities, Mathews was "very adamant" that the Petitioner was not involved. Mathews told Lax that he did not even know the Petitioner but that "there was a possibility he may have met [the Petitioner] at one time." Other than the Petitioner's confession, nothing in Lax's investigation indicated that the Petitioner had been involved in the Taco Bell crimes, and Lax thought Mathews committed the crimes alone. Post-conviction counsel for the Petitioner showed Lax a timeline, and he identified it as the timeline his company prepared for Mathews's case. The timeline excluded the Petitioner as

a participant in the murders.

Lax testified that after Mathews's trial, trial counsel for the Petitioner contacted Glori Shettles and asked if Inquisitor, Inc., would conduct a mitigation investigation for the Petitioner, who was facing the death penalty. At first, Lax determined that his company could not conduct the investigation because it had worked on Mathews's case. However, Jim Simmons and Skip Gant told Lax that a conflict would not exist if Inquisitor, Inc., did not disclose anything Mathews said. Lax met with Simmons, Gant, lead counsel, and co-counsel. He said that during the meeting, "parameters were set out," and Gant told lead counsel and co-counsel that the Petitioner was innocent. Lax said Simmons and Gant instructed him to provide lead counsel and co-counsel with "copies of all facets of our investigation with the exception of any memorandum documenting conversations or interviews we had with Courtney Mathews." Simmons and Gant also instructed him to prepare a redacted timeline for the Petitioner's attorneys. Lax prepared the timeline, which removed all references to conversations or interviews with Mathews.

Lax testified that at some point, the State decided not to seek the death penalty against the Petitioner. He said that although Inquisitor, Inc., had not been appointed to do any guilt/innocence work for the Petitioner's case, Shettles "did do some interviews toward the end just before trial to help [Larry] Wallace." He stated, "In hindsight, when death was removed, Ms. Shettles should have stopped at that point, and not provided any other assistance." Lax acknowledged that Mathews and the Petitioner were his clients and that he owed a duty of loyalty to both of them. He stated that investigators were obligated "[t]o investigate everything they possibly can and to keep their [clients'] confidence." However, he acknowledged that investigators also had a duty to share information with their clients. Post-conviction counsel for the Petitioner showed Lax a copy of the Rules of Professional Conduct and Standards of Practice for private investigators that were in effect in 1996 and 1997. According to Rule 1175-4-.05, licensed investigators were to "avoid all conflicts of interest with his her employer or client." Counsel asked Lax if he thought a conflict of interest existed in this case, and he said,

> In this situation no, I did not think so. We were asked to provide mitigation investigation. [Lead counsel and co-counsel for the Petitioner] knew we had worked extensively for Courtney Mathews. Mr. Gant and Mr. Simmons sat in the office with [co-counsel and lead counsel] and told them that their client was innocent. It was agreed that we would work with them under the understanding that nothing Mr. Mathews had to say to us was divulged.

> Then an affidavit was prepared, and an order was given --
> or a motion was made in the court, and the Court approved us to
> provide investigative services. I felt that with notification to
> everyone, and acceptance, and everyone was in agreement.

When asked if he thought the Petitioner was innocent of the Taco Bell crimes, Lax said yes.

On cross-examination, Lax testified that after the State decided to drop the death notice in the Petitioner's case, Shettles continued to help the Petitioner's defense by interviewing some witnesses. Lax did not learn that lead counsel and co-counsel had obtained the undredacted timeline until after the Petitioner appealed his convictions.

Isaiah "Skip" Gant testified that he represented Courtney Mathews at trial. During Gant's investigation of Mathews's case, he never developed credible evidence that the Petitioner was involved. Regarding the Petitioner's proffer statement, Gant said that "nobody could believe that his proffer was true." However, Gant did not remember raising any concerns about the proffer statement with the district attorney's office. Gant identified an undredacted timeline that contained summaries of interviews with witnesses, including Mathews. He acknowledged that Mathews's account of the Taco Bell crimes did not implicate the Petitioner.

On cross-examination, Gant testified that in addition to the Petitioner, other witnesses falsely claimed to have participated in the murders. Based upon the evidence, Gant knew that the Petitioner was not involved. Gant acknowledged that he investigated Mathews's case but not the Petitioner's case. At Mathews's trial, the State's theory was that Mathews acted alone. However, Gant said that "[t]here was some talk about some gang being involved." He acknowledged that he presented evidence at Mathews's trial to show that other individuals, including a white individual, were present during the crimes. He also acknowledged that he tried to show that the State failed to prove its case because someone other than Mathews could have committed the crimes. Gant said he told lead counsel and co-counsel that they could have access "to what we have." However, he did not give them access to Mathews's statements, and they could have only nonprivileged, nonconfidential information. Any information Gant obtained from Mathews was confidential. Gant used the unredacted timeline to prepare for Mathews's trial, and he acknowledged that he instructed Ron Lax to prepare a redacted timeline for lead counsel and co-counsel. Gant told co-counsel and lead counsel that the Petitioner was innocent. He said he knew the Petitioner was innocent because the Petitioner's statement "couldn't be the way he said it was." Gant acknowledged that some of the information Mathews gave him was untrue. However, on redirect examination, Gant testified that he had no reason to think Mathews withheld information from him.

-29-

Glori Shettles testified that she had been a mitigation investigator for Inquisitor, Inc., since 1993. In December 1996, she was appointed to work on the Petitioner's case. Shettles met with him in jail and interviewed his family, friends, and former employers. She gathered information that would have been favorable to the Petitioner at sentencing, but the Petitioner's attorneys never contacted her about the information. Shettles also worked as a mitigation investigator for Courtney Mathews. She met with Mathews, and he described how the Taco Bell murders were committed. Based on what Shettles knew about the investigation of Mathews's case, she thought he committed the crimes alone. In September 1997, the State stopped seeking the death penalty against the Petitioner. At his attorneys' request, Shettles continued to work on his case. She said that Larry Wallace was working as the Petitioner's "guilt innocence investigator" and that Inquisitor employees helped Wallace locate witnesses. Shettles acknowledged that Inquisitor employees worked with Wallace as "one big guilt innocence investigative team."

Shettles testified that "part of the agreement" for her to work on the Petitioner's case was that she could not tell the Petitioner about her conversations with Mathews. She acknowledged that Mathews gave her information exculpatory to the Petitioner's case. She said, "[B]ut I thought that it was known." Shettles had never worked on another case in which she had to keep helpful information from a client. She said she knew the Petitioner was not guilty because nothing in the investigation showed he was involved in the Taco Bell robbery.

Danese Banks testified that she had been an attorney since 1996 and worked for Inquisitor, Inc., from 1996 to 2000. Banks worked on the guilt/innocence portion of Courtney Mathews's investigation. She talked with Mathews and learned details about the Taco Bell crimes. Banks helped create a timeline in his case, and she concluded that he acted alone. Banks said she did not remember working on the Petitioner's case. However, she identified documents showing that she located witnesses for the Petitioner.

Helen Young testified that she began working as an attorney for the district attorney's office in Clarksville two weeks before the Taco Bell crimes and was involved in the prosecution of Courtney Mathews. The district attorney's office had an "open file" policy with Mathews's attorneys. Near the time of Mathews's trial in June 1996, the district attorney's office disqualified itself from the Petitioner's case. On February 7, 1997, the trial court signed an order for the disqualification. Based on the evidence, Young thought the Petitioner was guilty. She said that "all of them had been at this trailer, there had been discussion primarily by [Mathews] that he was going to do this." She said that she thought the Petitioner "went in with [Mathews] for whatever reason" but that "it was [Mathews] doing the shooting."

Robert "Gus" Radford testified that he served as the District Attorney General for the Twenty-Fourth Judicial District for twenty-four years and was appointed to prosecute the Petitioner after General Carney's office recused itself. At the time of the appointment, the Petitioner was facing the death penalty. Radford received investigative and secretarial assistance from General Carney's office. He said he also received help from Jeff Puckett, "who was the Agent in charge." Radford's office did not prosecute Courtney Mathews and did not participate in the investigation of Mathews's case. However, Radford had a transcript of Mathews's trial. Radford said that he turned over everything from discovery that was required and that lead counsel was "free to look" in the Petitioner's file. Radford said he did not remember giving Larry Underhill anything in exchange for Underhill's testimony against the Petitioner. However, he identified a letter written by Underhill, stating that Radford had promised to write letters to the parole board on Underhill's behalf. Radford said he never made such a promise and that he turned over the letter to defense counsel. Radford also identified a letter from Underhill in which Underhill requested that he not lose his prison cell while he was testifying at the Petitioner's trial. Radford said he did not remember contacting anyone at the prison. He acknowledged that at the Petitioner's trial, Underhill denied receiving anything in exchange for Underhill's testimony.

Radford acknowledged that after the jury convicted the Petitioner, Radford received a timeline. He reviewed the timeline, but it did not change his opinion of the Petitioner's guilt. The State's theory of the case was that Mathews was the shooter and that the Petitioner acted as a lookout or drove the getaway car. Radford acknowledged that the timeline did not "accord with" the State's theory that the Petitioner participated in the robbery or helped plan the crimes. He said that he did not consider the timeline to be credible evidence and that he still thought the Petitioner was guilty.

On cross-examination, Radford testified that he decided not to pursue the death penalty against the Petitioner because the shooter, Mathews, was not sentenced to death. Lead counsel did not think the Petitioner was guilty and wanted Radford to dismiss the case. Radford said that lead counsel was a "hard-fighting adversary" for the Petitioner and that lead counsel "held my feet to the fire."

Robert C. Inserra testified that in 1994, he was the Special Agent in Charge of the CID office at Fort Campbell. After the Taco Bell crimes, Inserra assigned Agent Carter Smith to the case due to Mathews's being in the military. However, civilian officers and agencies did most of the work in the case. According to a report about the case filed by the CID in September 1994, the Petitioner was not suspected of having participated in the Taco Bell crimes.

Carter Smith testified that in 1994, he was a CID special agent for the Army at Fort

Campbell and was assigned to the Taco Bell case. According to a CID report, the Petitioner was not suspected in the crimes.

Lanny Wilder, the Assistant Director of the TBI, testified that in 1994, he was the Director of the TBI's Nashville Laboratory. Wilder administered two polygraph examinations to the Petitioner. The first examination occurred in March 1994, and the second occurred in October 1995. Agent Jeff Puckett requested both examinations, and the Petitioner signed polygraph waiver of rights forms and Miranda waiver of rights forms for the exams. Agent Puckett witnessed the second examination but not the first examination. Although the Petitioner had an attorney at the time of the second polygraph, counsel was not present during the examination.

Lead counsel testified that he graduated from law school in 1974 and worked for the Tennessee Attorney General for ten years, handling civil litigation and some criminal appeals. In 1984, he entered private practice, and in 1994, he opened his own law firm, focusing on federal civil and criminal litigation. In December 1995, the trial court appointed him to represent the Petitioner. Co-counsel worked for lead counsel's law firm and assisted him with the case. Lead counsel spoke with pretrial counsel several times. Lead counsel acknowledged that the Petitioner had been interrogated at the CID office and said that he did not remember if the Petitioner received Miranda warnings prior to the interrogations. He said he thought that "if there was a waiver it had to do with a polygraph and not Miranda." The Petitioner gave a statement to authorities on March 21, 1994. In the statement, he claimed he overheard Mathews talking about planning to commit a robbery. Lead counsel said that the Petitioner gave the statement in order to obtain a bond reduction and that the statement was "fruit" of the statements he gave at the CID office. Lead counsel acknowledged that if the Petitioner had not given the March 21 statement, authorities would have had no reason to call him back to Clarksville in October 1995. Therefore, the Petitioner's proffer statement was "a fruit" of his previous statements.

Lead counsel acknowledged that during an interview with the Petitioner on October 20, 1995, Agent Jeff Puckett asked the Petitioner, without pretrial counsel present, if the Petitioner was telling the truth. Lead counsel also acknowledged that the Petitioner told Agent Puckett that he gave Mathews the idea to kill the victims. Nothing indicated that the Petitioner was advised of his Miranda rights prior to his admission. Pretrial counsel was present for the remainder of the Petitioner's interview. However, pretrial counsel was not present when the Petitioner gave his proffer statement later that day. Lead counsel did not remember if the Petitioner received any Miranda warnings prior to giving the proffer statement. Lead counsel said that the Petitioner's story about the Taco Bell crimes changed "when a carrot was put in front of him" and that "[w]e should have gone after the voluntariness of those statements. We should have attacked those statements as being in

violation of Miranda, as being involuntary." The trial court held a pretrial suppression hearing in April 1997. Lead counsel acknowledged that at the hearing, the defense challenged the admissibility of the proffer statement based only on the fact that it was substantially false. He explained,

> We put the statements in the binder and took them to the suppression hearing and tried to use them to show that the final statement was not true, which is something I believe 110 percent. But the -- and, again, there was an -- there was a - another course that we could have pursued at the same time, and that would have been that they were -- they were coerced, not voluntary, not Mirandized.

However, lead counsel also said that the Petitioner's statements were beneficial to the defense "because they show, really, that the final statement was nonsense."

Lead counsel testified that the Petitioner signed a negotiated plea agreement on November 19, 1995. According to the agreement, the Petitioner's false proffer statement could be used against him if he breached the agreement. Lead counsel said that the State's use of the proffer statement would have been inconsistent with the Tennessee Rules of Criminal Procedure and that a breach of the agreement should have resulted in the proffer statement being inadmissible. He stated,

> So typically, you would make the statement if it's truthful the -- the agreement is to [plead] guilty, you [plead] guilty, you provide the cooperation, you get the benefit of the cooperation and you're sentenced. If that process breaks down, the proffer itself is part of the negotiation of the guilty plea, and the negotiation of a guilty plea, it's negotiation, and you don't agree to allow a broken down negotiation to be used against you if it breaks down.

The proffer agreement also gave the State unilateral power to determine the value and truth of the Petitioner's proffer statement. Lead counsel said that such unilateral power was not unusual; however, if the State declared a breach, "back to your corners, start all over again. You know, you're back to where you were before you started this." He said that it would have been "below the standard of representation" for an attorney to have allowed a client's statement to be used against the client in the event of a breach and that "nobody gets evidence from a negotiation."

Lead counsel testified that the Petitioner never entered a guilty plea pursuant to the proffer agreement because the State declared the Petitioner breached agreement by implicating Sulyn Ulangca in the crimes. Lead counsel thought the Petitioner falsely implicated Ulangca in a conspiracy and, therefore, that the State could prove the Petitioner breached the agreement. However, lead counsel said that General Carney's use of the proffer statement to indict the Petitioner and General Radford's use of the statement at trial "certainly [made] the argument" that the State did not consider the breach to be a material breach.

Lead counsel acknowledged that he did not file a motion to quash the indictment based on the State's improper use of the proffer statement. He said the defense should have argued that the statement was inadmissible under Rule 410, Tennessee Rules of Evidence, because it was made in the course of plea negotiations. He stated that Rule 410 "was a clean, clear shot rather than trying to prove the falsity [of the statement]." The proffer agreement did not contain an express waiver of Rule 410, and nothing indicated that the Petitioner had been advised about waiving the Rule. Lead counsel acknowledged that Rule 11, Tennessee Rules of Criminal Procedure, incorporated Rule 410 and said that the defense also did not try to exclude the proffer statement from evidence pursuant to Rule 11. He stated that the defense's failure to argue either rule at the motion to suppress hearing was a mistake and "[a]bsolutely" prejudiced the Petitioner. Lead counsel never challenged the legality of the proffer agreement. He said that, in his opinion, the State did not have a case without the proffer statement and that the defense should have argued that the State either had to give the Petitioner "the benefit of the deal or not use the statement. That's typically the process."

Lead counsel testified that after a jury convicted Mathews, he and co-counsel met with Jim Simmons and Skip Gant. He acknowledged that Gant told him and co-counsel that the Petitioner was innocent. Lead counsel said he could tell from Gant's body language that Mathews had told Gant that the Petitioner was not involved in the crimes. Glori Shettles from Inquisitor, Inc., worked on the Petitioner's defense, and her work was not restricted to mitigation. Lead counsel did not think that Inquisitor's involvement in both cases was a conflict of interest. However, lead counsel later learned that Shettles had received information from Mathews that the Petitioner was innocent. Lead counsel said that it "[seemed] like" Shettles had an obligation to tell the defense what Mathews revealed to her. Lead counsel did not remember an agreement in which Inquisitor's investigators could work on the Petitioner's case if they did not reveal any information from Mathews. Lead counsel subpoenaed Mathews for the Petitioner's trial but thought calling Mathews to testify for the defense was "too risky" because lead counsel was not sure Mathews would tell the truth and exonerate the Petitioner. Lead counsel had hoped Mathews would sign an affidavit stating that the Petitioner was not involved in the crimes, but Mathews refused.

Lead counsel testified that the defense received a redacted timeline of the crimes and that co-counsel found an unredacted timeline. The unredacted version contained information from interviews with Mathews, which Simmons and Gant determined was protected by attorney/client privilege. The unredacted timeline would have been beneficial to the Petitioner's defense because it corroborated other evidence in the case and did not mention the Petitioner. Lead counsel said, "[I]t was a mistake not to involve . . . that unredacted timeline in the trial." Lead counsel said he should have called Ron Lax to testify as a witness at trial and should have tried to introduce the timeline into evidence through Lax. Lead counsel stated that although the trial court may have excluded the timeline from evidence based on privilege, Lax "should have had this [timeline] stuck in his face, and see what happens." Lead counsel was not aware of Larry Underhill's letters to General Radford until after the Petitioner's appeals concluded.

On cross-examination, lead counsel testified that he did not have trouble communicating with the Petitioner. The defense worked hard on the Petitioner's case, used the resources available, and spent a lot of time preparing for trial. Lead counsel thought he and co-counsel were prepared for trial, given the resources they had for the case. Lead counsel said that in retrospect, he was concerned about two issues: The defense's failure to argue that the proffer statement was inadmissible under Rule 410, Tennessee Rules of Evidence, and the defense's failure to use the unredacted timeline at trial. He stated that, arguably, "a reasonably prudent attorney would have gone further and done a better job on those issues than we did." He acknowledged that the Petitioner's initial statements at the CID office were exculpatory because the Petitioner denied any involvement in the Taco Bell crimes. Nevertheless, if lead counsel had successfully excluded those statements and the Petitioner's March 1994 statements from evidence, the proffer statement may have been excluded as fruit of the poisonous tree. Without the proffer statement, the State might not have pursued the case against the Petitioner. Lead counsel acknowledged that in the unredacted timeline, a witness named Allen Charvis claimed he heard Mathews and the Petitioner at the party trailer discussing the robbery. Therefore, the timeline implicated the Petitioner. In addition, James Bowen testified at trial that he heard the Petitioner and Mathews talking about the robbery. However, Bowen also testified at trial that the Petitioner and Sulyn Ulancga were sleeping in the bedroom next to his at the time of the Taco Bell crimes. Lead counsel said that when the Petitioner "went from witness to target," pretrial counsel should have stopped the Petitioner from meeting with prosecutors and police until pretrial counsel "ascertained [the Petitioner] was a target and ascertained his exposure."

Lead counsel acknowledged that the proffer agreement specifically prohibited the Petitioner from falsely implicating anyone in the crimes and said that the State would have been able to show that the Petitioner breached the agreement. The defense's theory was that Mathews acted alone, that the Petitioner's proffer statement was false, and that the statement

should not be used in the courtroom. Lead counsel thought the jury would recognize the falsity of the statement. When asked if Mathews could have argued that the information in the unredacted timeline was privileged, lead counsel said, "I cannot answer. . . . You're asking me to make a -- essentially a judicial ruling on a legal question." He stated that Mathews's version of the crimes was credible because it was consistent with the forensic evidence. He acknowledged that although Mathews's version did not mention the Petitioner, there was no evidence that the Petitioner was inside Taco Bell at the time of the crimes.

On redirect examination, lead counsel testified that "we wanted this [proffer] statement out of the case." Even before the State gave Sulyn Ulangca a polygraph and talked with her, it should have recognized from its investigation that the Petitioner's proffer statement was false.

Lead counsel's testimony concluded on December 18, 2009, and the Petitioner rested his case. The State did not present any witnesses.

On September 23, 2010, the post-conviction court filed a written order granting the Petitioner's petitions for post-conviction relief and writ of error coram nobis. Regarding the petition for post-conviction relief, the court determined that the Petitioner received the ineffective assistance of counsel on the following issues:

> 1. Trial counsel should have challenged the State's declaration that the Petitioner breached the proffer agreement because the State would have been unable to show that the Petitioner "materially" breached the agreement.
>
> 2. Trial counsel should have challenged the proffer agreement as void and illusory because it allowed the State to determine unilaterally if the Petitioner breached the agreement.
>
> 3. Trial counsel should have challenged the State's use of the proffer statement against the Petitioner because the State could not use the statement pursuant to Rule 410, Tennessee Rules of Evidence.
>
> 4. Trial counsel should have challenged the admissibility of the proffer statement pursuant to Miranda v. Arizona, 384 U.S. 450 (1966).
>
> 5. Trial counsel used investigators who had a conflict of interest

due to their work in Mathews's case.

Regarding the petition for writ of error coram nobis, the post-conviction court determined that the Petitioner was entitled to relief because newly discovered evidence had become available from witnesses who could now testify for the Petitioner that Mathews told them he committed the murders alone. The State appeals the post-conviction court's granting the petitions.

### III. Post-Conviction Analysis

On appeal, the State challenges the post-conviction court's findings regarding the Petitioner's receiving the ineffective assistance of counsel. Specifically, the State contends that the court erred by concluding that counsel's performance was deficient because counsel (1) failed to challenge the State's declaration of a material breach; (2) failed to challenge the proffer agreement as void and illusory due to the State's unilateral power to declare a breach; (3) failed to challenge the admissibility of the proffer statement under Rule 410, Tennessee Rules of Evidence; (4) failed to challenge the admissibility of the proffer statement under Miranda; and (5) retained Mathews's investigators for the investigation of the Petitioner's case. The Petitioner argues that the post-conviction court properly granted his petition for post-conviction relief.[4] We agree with the Petitioner.

To be successful in a claim for post-conviction relief, a petitioner must prove factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's

---

[4]The Petitioner also raises numerous counter-claims. However, given our conclusion that the post-conviction court properly granted the petition for post-conviction relief, it is unnecessary to address those claims.

findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

A. Failure to Challenge State's Declaration of a "Material" Breach

The State contends that the post-conviction court erred by determining that trial counsel rendered ineffective assistance for failing to challenge the State's declaration of a "material" breach. The State argues that the benefit it expected to receive under the proffer agreement was complete and truthful information; that the Petitioner provided a "considerable amount" of untrue information to authorities, including falsely accusing Sulyn Ulangca and two others; and that the Petitioner's lies, particularly his falsely implicating Ulangca, constituted a material breach of the agreement. The Petitioner argues that counsel should have challenged the State's declaration of a breach because the State could not prove the breach was material. We conclude that the Petitioner materially breached the agreement but that the State's remedy for the breach did not include using the statement to convict him of four counts of first degree premeditated murder. Therefore, counsel was ineffective for failing to challenge the State's declaration of a material breach.

In its order granting post-conviction relief, the post-conviction court specifically

-38-

found that the agreement at issue was a plea agreement. However, at the time the parties entered into the agreement, the Petitioner had not been charged with an offense related to the Taco Bell crimes. As the Fourth Circuit Court of Appeals explained,

> [A] grant of immunity differs from a plea agreement in that it in no way involves court approval. In the case of a plea agreement, the court in essence executes the agreement by accepting the plea of guilty. In the case of a grant of immunity, however, only two parties are involved. The government alone makes a decision not to prosecute in exchange for testimony which will, hopefully, lead to a greater number of indictments or convictions. The most that one granted immunity can do is to agree to testify and then await the call of the government.

Plaster v. United States, 789 F.2d 289, 293 (4th Cir. 1986). An agreement such as this one, in which a prosecutor promises not to prosecute a defendant fully in exchange for the defendant's truthful information and testimony, is a cooperation-immunity agreement. See State v. Howington, 907 S.W.2d 403, 404-05 & n.1 (Tenn. 1995).

Cooperation-immunity agreements, like plea agreements, are enforceable as contracts. Id. at 408; State v. Spradlin, 12 S.W.3d 432, 435 (Tenn. 2000). However, a cooperation-immunity agreement "is different from the average commercial contract as it involves a criminal prosecution where due process rights must be fiercely protected." Howington, 907 S.W.2d at 410. As a result, a court must construe any ambiguities in the agreement against the State. Id. "What constitutes a breach of the agreement is governed by the agreement itself." State v. Larry Cunningham, No. 02-C-01-9506-CC-00172, 1996 Tenn. Crim. App. LEXIS 596, at *8 (Jackson, Sept. 30, 1996) (citing Howington, 907 S.W.2d at 410). In order for the State to show that a defendant breached an agreement, it "must prove beyond a reasonable doubt that [the defendant] failed to deliver on his part of the deal." Howington, 907 S.W.2d at 409. The following circumstances are to be considered when determining whether a breach is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to

offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Howington, 907 S.W.2d at 410-11 (quoting Restatement (Second) of Contracts § 241). In addition, "in the area of informal immunity agreements where a criminal defendant is necessarily involved, 'the most important consideration is the incriminating nature of the proferred [sic] statements, not the amount of information provided to the government.'" Id. at 411 (quoting United States v. Fitch, 964 F.2d 571, 574 (6th Cir. 1992)).

"Although the interpretation of a contract is a question of law which we review de novo, with no presumption of correctness for the conclusions of the trial court, State ex rel. Pope v. U.S. Fire Insurance Co., 145 S.W.3d 529, 533 (Tenn. 2004), the determination of whether a breach has occurred is a question of fact for the trier of fact." Regions Bank v. Thomas, No. W2011-02320-COA-R3-CV, 2013 Tenn. App. LEXIS 156, at *23 (Jackson, March 4, 2013). Our supreme court has held that a defendant's failure to testify truthfully when an agreement specified that he do so constituted a material breach. See State v. Mellon, 118 S.W.3d 340, 347 (Tenn. 2003). Moreover, as the Sixth Circuit explained,

"Although an inadvertent omission or oversight would not rise to the level of a materially false statement so as to constitute a breach of the agreement, a bad faith, intentional, substantial omission . . . does constitute a materially false statement and thereby a breach of the agreement."

Fitch, 964 F.2d at 574 (quoting United States v. Castelbuono, 643 F. Supp. 965, 971 (E.D.N.Y. 1986)).

Turning to the instant case, the post-conviction court, without considering the Howington factors, determined that the Petitioner's breach was not material because, although his statement falsely implicated Sulyn Ulangca, it contained other information that incriminated Courtney Mathews. Therefore, the State received the benefit of its bargain with the Petitioner. The post-conviction court also concluded that even if the State could show a material breach, the State's only two remedies were specific performance of the agreement,

-40-

i.e., allowing the Petitioner to plead guilty and receive the effective fifteen-year sentence, or rescission of the agreement, which would have put the parties in the same position they were before they entered the agreement.

Paragraph 3 of the agreement's "terms and conditions" provided that the Petitioner had to "supply complete and truthful information to the attorneys and law enforcement officers of the government, the State grand jury conducting this investigation, and the Court." The paragraph also specified that the Petitioner "must neither attempt to protect any person or entity through false information or omission, nor falsely implicate any person or entity." Paragraph 1 stated that if the Petitioner violated the terms of the agreement, then the information "may and will be used against him for any purpose, including prosecution for crimes other than perjury." Paragraph 6 of the agreement specified that "any untruth within the proffer may be the predicate for additional criminal charges, if it appears that he has falsely implicated an innocent person."

The State contends that the Petitioner's lies, particularly his lies about Ulangca, Darwish, and Tween participating in the Taco Bell crimes, resulted in the State's being deprived of the benefit it expected from the proffer statement: truthful information about the crimes. We agree with the State. The record demonstrates that the benefit the State expected was truthful information the State could use to prosecute Mathews and others involved in the murders. However, the Petitioner lied throughout the statement, and his untruths misled the State and deprived the State of that benefit. The trial court found that the breach was not material because the statement contained other information that incriminated Mathews. However, nothing in record indicates that the State used the Petitioner's statement to further its case against Mathews, and the State did not call the Petitioner to testify against Mathews at trial, presumably because the Petitioner had become too untrustworthy to call as a witness. We note that, despite the Petitioner's lying in the statement, the State still received some benefit from its bargain because the agreement provided that the Petitioner would be charged with conspiracy to commit first degree murder for his participation in the crimes. Moreover, although the State claims that the Petitioner's statement was so false that it deprived the State of the benefit it expected, the State used the Petitioner's statement partially for its truth to convict him of four counts of first degree murder. Nevertheless, the Petitioner's lies were so extensive and egregious that this factor weighs heavily in support of the State's theory of a material breach.

Regarding the extent to which the State could be compensated adequately for the breach, the agreement provided that the State could prosecute the Petitioner for crimes such as perjury. However, revoking the agreement so that the State could prosecute him for the substantive crimes would be the adequate compensation. Thus, this consideration weighs in favor of finding a material breach. Regarding the extent to which the Petitioner's behavior

failed to comport with standards of good faith and fair dealing, we note that the Petitioner returned to Clarksville every time he was summoned by authorities and gave a statement every time they requested one. Nevertheless, the evidence shows that the Petitioner intentionally and repeatedly lied in his proffer statement, which supports finding a material breach. Finally, the Petitioner gave self-incriminating information about the crimes, information so self-incriminating that it ultimately resulted in his being tried and convicted of four counts of first degree murder. The degree of the incriminating information does not support a finding of a material breach. Although a close case, we conclude that the State has shown that the Petitioner materially breached the agreement.

Having concluded that the Petitioner materially breached the agreement, we must determine the appropriate remedy. As the post-conviction court correctly noted, in the event of a defendant's material breach, the State either can specifically enforce the agreement or rescind the agreement. See State v. Mellon, 118 S.W.3d 340, 346 (Tenn. 2003) (stating that if a defendant breaches a plea agreement, the State has the option to specifically enforce the agreement or rescind it). "An order of specific performance is intended to produce as nearly as is practicable the same effect that the performance due under a contract would have produced. It usually, therefore, orders a party to render the performance that he promised." Restatement Second of Contracts § 357 cmt. a (1981). The State did not choose this remedy. In any event, had the state chosen specific performance, it would have been bound to charge the Petitioner with conspiracy to commit first degree murder and enter into a plea agreement with him for guilty pleas to that charge and robbery in exchange for an effective fifteen-year sentence. Instead, the State chose rescission in which "the parties are restored to their respective positions prior to the transaction." Blanco v. United States, 602 F.2d 324, 327 (Ct. Cl. 1979). The Petitioner gave his statement after he and the State entered into the proffer agreement. Therefore, rescission of the agreement did not allow use of the statement to convict him of four counts of first degree murder, and the Petitioner was prejudiced by trial counsel's failure to challenge the materiality of the breach.

B. Failure to Challenge Proffer Agreement as Void and Illusory

Next, the State claims that the post-conviction court erred by determining that trial counsel were ineffective for failing to challenge the proffer agreement as void and illusory because it allowed the State to determine unilaterally if the Petitioner was truthful in his statement. The State argues that the proffer agreement was a valid bargained-for exchange and that the trial court would not have invalidated it "under Howington or any other principle of law." The State also contends that even if the unilateral provision of the proffer agreement was unenforceable, it did not invalidate the entire agreement. The Petitioner argues that the proffer agreement was unenforceable because the trial court did not approve it pursuant to Tennessee Rules of Criminal Procedure 11. The Petitioner also argues that the post-

-42-

conviction court correctly determined that the agreement was unenforceable due to the State's unilateral authority to declare a breach. We conclude that the State's unilateral power to declare a breach was unenforceable and that the Petitioner has shown he was prejudiced by trial counsel's failure to challenge the agreement on that ground.

The proffer agreement provided, "Whether or not [the Petitioner] has told the truth is an issue that [the district attorney's] office shall decide in its sole discretion." In his post-conviction petition, the Petitioner argued that the proffer agreement was void and illusory because it gave the State "complete and unfettered unilateral power" to determine a breach. The post-conviction court, with little explanation, agreed with the Petitioner, concluding that "[i]n light of due process concerns, it is unlikely that the trial court would have upheld the validity of an agreement in which the State could declare a breach without judicial declaration that a breach had occurred." Moreover, the court stated, without any explanation, that "had counsel challenged this provision of the agreement, it would have led to the [trial court] declaring that this provision rendered the entire agreement void."

First, we will address the Petitioner's claim that the proffer agreement was unenforceable because it had not been approved by the trial court pursuant to Tennessee Rules of Criminal Procedure 11(c) regarding a trial court's acceptance or rejection of a guilty plea. We disagree with the Petitioner. Once again, the agreement at issue was a cooperation-immunity agreement. While similar to a plea agreement, adherence to a cooperation-immunity agreement "is the responsibility of the prosecutor alone while a plea agreement is subject to the approval of the court." United States v. Mark Dorsett, 2009 U.S. Dist. LEXIS 64203, at *11 (D. Neb. July 23, 2009) (citing United States v. Minnesota Mining & Mfg. Co., 551 F. 2d 1106, 1112 (8th Cir. 1977)); see State v. John A. Boatfield, No. E2000-01500-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 955, at *23 (Knoxville, Dec. 20, 2001) (noting that Howington differentiated between immunity and plea agreements and stating that "[t]he Howington court . . . clearly stated plea agreements were only enforceable once the condition precedent of the trial court's acceptance of the agreement is met"). Therefore, approval of the proffer agreement by the trial court pursuant to Rule 11, Tennessee Rules of Criminal Procedure, was not required in order for the agreement to be enforceable.

Next, we will determine whether the State's unilateral power to declare the truth of the Petitioner's proffer statement invalidated the proffer agreement. As stated previously, for cases involving a cooperation-immunity agreement, due process rights must be "fiercely protected." Howington, 907 S.W.2d at 410. As a result, the State must be held to a high evidentiary standard when it tries to show that a defendant breached an agreement. Id. Although not addressed by any courts in this state, federal courts have held that when the government determines that a defendant has breached the terms of a cooperation-immunity

agreement and intends to be relieved of its part of the bargain, due process prevents the government from making that determination unilaterally. United States v. Meyer, 157 F.3d 1067, 1076 (7th Cir. 1998); United States v. Castaneda, 162 F.3d 832, 836 (5th Cir. 1998); United States v. Brown, 801 F.2d 352, 355 (8th Cir. 1986); G.D. Searle & Co. v. Interstate Drug Exchange, Inc., 117 F.R.D. 495, 502 (E.D.N.Y. 1987); United States v. Mark Dorsett, No. 8:08CR356, 2009 U.S. Dist. LEXIS 64203, at *12 (D. Neb., July 23, 2009).

Given the due process concerns involving cooperation-immunity agreements, particularly agreements that give the State the right to use a defendant's incriminating statement against him in the event of a material breach, we are persuaded by federal authority that the unilateral provision did not invalidate the entire agreement but that the State's unilateral power to declare a breach was unenforceable and that judicial determination of the breach was required. Therefore, had trial counsel challenged the State's declaration of a material breach, the Petitioner would have been entitled to a judicial determination of the issue. Moreover, based upon our conclusion in the previous section that the trial court would have determined that the Petitioner materially breached the agreement but that the State's remedy would have prevented it from using the Petitioner's statement, the Petitioner has shown that he was prejudiced by trial counsel's failure to challenge the State's unilateral power to declare a breach.

C. Failure to Challenge Proffer Statement Pursuant to Tennessee Rule of Evidence 410

The State contends that the post-conviction court erred by determining that trial counsel were ineffective for failing to challenge the admissibility of the Petitioner's proffer statement pursuant to Rule 410, Tennessee Rules of Evidence. The Petitioner contends that the court properly concluded that he received the ineffective assistance of counsel. We agree with the Petitioner.

Relevant to this case, Tennessee Rule of Evidence 410 provides as follows:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
>
> . . . .
>
> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later

withdrawn. Such a statement is admissible, however, in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

Similarly, prior to 2007, Rule 11(e)(6), Tennessee Rules of Criminal Procedure, provided that "evidence of a plea of guilty, later withdrawn, . . . or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer."[5]

The right guaranteed by Rule 410 is waivable. See State v. Hinton, 42 S.W.3d 113, 123-24 (Tenn. Crim. App. 2000) (citing United States v. Mezzanatto, 513 U.S. 196 (1995)). In Hinton, this court addressed whether a defendant knowingly waived the rights afforded by Rule 410, Tennessee Rules of Evidence, and Rule 11(e)(6), Tennessee Rules of Criminal Procedure. The State argued that the defendant knowingly waived the rights afforded by the Rules because he gave the statement after being told that it could be used against him. This court stated,

> In the present case, however, we believe that the record affirmatively indicates that the defendant did not knowingly waive the specific rights afforded by Rules 410 and 11(e)(6). Tennessee courts have determined what constitutes a knowing waiver in the context of other rights, such as the waiver of the right to trial and the waiver of the right against self-incrimination. See State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977); State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). A "knowing" waiver is one that is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. (citing Fare v. Michael C., 442 U.S. 707 (1970); North Carolina v. Butler, 441 U.S. 369 (1979)). This standard for a knowing waiver has been applied, as well, to the waiver of the statute of limitations. See State v. Pearson, 858 S.W.2d 879, 887 (Tenn. 1993). In that case, our supreme court determined that defendants can waive the statute of limitations but that the waiver must be knowing and voluntary. Id. The court

---

[5]Tennessee Rule of Criminal Procedure Rule 11 was amended in 2007, and Rule 11(e)(6) was eliminated. Rule 11(d) now provides, "The admissibility of a plea, plea discussion, or any related statement is governed by Tennessee Rule of Evidence 410."

determined that no evidence existed in the record to indicate that the defendant's waiver was knowing and voluntary, stating that "there was no discussion at all of the expiration of the statute of limitations in the trial court." Id. It held that "[a] waiver . . . will not be presumed where there is no evidence . . . to indicate that the appellant was made aware of the issue." Id.; see also United States v. Young, 73 F. Supp. 2d 1014, 1024 (N.D. Iowa 1999) (holding that the defendant, who was informed only that his statement could be used against him if he backed out of the plea agreement, did not knowingly waive his rights pursuant to Rules 410 and 11(e)(6) because he was not "advised of the existence of a right not to have plea statements used in a subsequent trial or other proceeding."). Id. at 1024.

Hinton, 42 S.W.3d at 124.

Turning to the instant case, the State does not contest that the Petitioner gave his proffer statement in the course of plea negotiations. Instead, the State contends that the proffer agreement specifically waived any claim by the Petitioner that the proffer statement was inadmissible under Rule 410. The term of the proffer agreement on which the State relies provided,

If your client violates the terms of the agreement, any such testimony or other information provided by your client to attorneys or law enforcement officers of the government . . . may and will be used against him for any purpose, including prosecution for crimes other than perjury. No statement or other information provided by your client shall be deemed to be precluded from use against him in case of his breach of this agreement.

Initially, we again note that the agreement at issue was not a plea agreement. Nevertheless, the discussions between the Petitioner, the district attorney, and the investigators occurred in furtherance of the parties' plan for the Petitioner to plead guilty to conspiracy to commit murder.[6] The post-conviction court, citing Hinton, concluded that nothing in the record demonstrated that the Petitioner knowingly and voluntarily waived his rights under Rules 410 and 11(e)(6). We agree with the post-conviction court. The

[6]As noted previously, when asked if the proffer agreement could be considered a plea negotiation, General Carney answered, "It was taken in that context, yes."

Petitioner testified that pretrial counsel never explained the proffer agreement to him and never told him that the State would be able to use the proffer statement if he breached the agreement. Pretrial counsel, on the other hand, testified that he went over every sentence of the agreement with the Petitioner and told the Petitioner that the State could use the statement if he lied. Regardless, we have carefully reviewed the proffer agreement, and the agreement did not advise the Petitioner of his right not to have the proffer statement used against him in a subsequent trial or other proceeding and did not advise him that his signing the proffer agreement would constitute a waiver of that right. In fact, there is no indication that the Petitioner was even aware of the protections afforded by Rule 410. Therefore, we conclude that the Petitioner did not knowingly and voluntarily waive his right to argue that his proffer statement was inadmissible pursuant to Rule 410, Tennessee Rules of Evidence. Given that the Rule prohibited the State's use of the statement, counsel's failure to make that argument at the motion to suppress hearing constituted deficient performance. Moreover, as we explained above, the Petitioner was prejudiced by counsel's failure to have the statement excluded from evidence.

### D. Failure to Challenge Proffer Statement Under Miranda

The State claims in its appellate brief that the post-conviction court erred by determining that counsel were ineffective for failing to challenge the admissibility of the proffer statement pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), because the Petitioner raised the issue in a pretrial motion to suppress and the trial court rejected the argument. Thus, the issue was previously determined. The Petitioner contends that the post-conviction court, by written order,[7] prohibited the State from raising that affirmative defense due to "the State's repeated flouting of [post-conviction relief] rules," and that the State cannot raise the issue for the first time on appeal. The Petitioner also contends that the post-conviction court properly granted his petition for post-conviction relief because he did not receive Miranda warnings prior to his custodial interrogations in October 1995. The State, apparently conceding that it has waived the "previously determined" defense pursuant to Rule 36(a), Tennessee Rules of Appellate Procedure, replies that the Petitioner cannot show he received the ineffective assistance of counsel because he was advised of his Miranda rights before he gave his October 1995 statements and had counsel present. We conclude that the post-conviction court erred by concluding that counsel rendered deficient performance for failing to challenge the admissibility of the proffer statement under Miranda.

---

[7]According to the order, filed on November 30, 2009, the post-conviction court barred the State from further asserting the affirmative defenses of waiver and previous determination. The court filed the order to "impose appropriate sanctions" pursuant to Tennessee Supreme Court Rule 28, section 5(I), because the State had failed to assert the affirmative defenses in a separate motion to dismiss as required by Tennessee Supreme Court Rule 28, section 5(G).

In his post-conviction petition, the Petitioner claimed, in relevant part, that he gave his proffer statement in violation of Miranda because his statement was "the product of an inherently coercive interrogation that lasted three days." The post-conviction court agreed with the Petitioner, concluding that his proffer statement was involuntary because he did not receive Miranda warnings prior to his October 1995 interviews. The court determined that although the Petitioner was not under arrest when he entered the proffer agreement, he was "in custody" for Miranda purposes under the totality of the circumstances. Specifically, the court determined that the Petitioner was "in custody" due to the number of prosecutors and police officers present for his interviews; the intensity of their demeanor; their challenging the Petitioner's statements and asking him for additional information; the absence of pretrial counsel during portions of the interviews on October 19 and 20; the Petitioner's requesting several times that authorities stop questioning him; and the fact that the interviews lasted several hours each day with the parties taking few breaks.

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained:

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009). In determining whether a suspect is in custody for Miranda purposes, we must consider "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). The analysis is very fact-specific. Certain factors are relevant to our inquiry, including but not limited to the following:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. The question of whether a person is "in custody" for Miranda purposes is objective and does not depend upon the officer's subjective intention or the suspect's subjective perception. State v. Crutcher, 989 S.W.2d 295, 304 (Tenn. 1999).

The testimony at the evidentiary hearing reflects that although the Petitioner transported himself to the district attorney's office, he had to go to the office when summoned as a condition of his bond. The Petitioner did not receive Miranda warnings prior to his October 1995 interviews,[8] numerous prosecutors and officers were present during his interviews, and the interviews were lengthy and intense. Moreover, the post-conviction court obviously accredited the Petitioner's testimony that the prosecutors and officers continued to question him even though he asked for the questioning to stop and that he did not feel free to leave. However, the Petitioner never testified that the authorities accused him of the crimes, told him that he had to answer their questions, or told him that he could not leave the district attorney's office. To the contrary, after the Petitioner's October 19 interview, he was allowed to leave the office and spent the night in a hotel. The next day, he returned for more questioning, gave his proffer statement, and was allowed to leave the office and return to Kentucky. The proffer agreement specified that the Petitioner was to remain on bond, and he remained free on bond until he returned to the district attorney's office on November 7.

_____

[8]As noted by the post-conviction court, Lanny Wilder testified that the Petitioner signed a waiver of rights form prior to his polygraph examination on October 20, 1995. The post-conviction court concluded that the waiver "was limited to the unique context of the examination and was not effective within the context of the questioning which the Petitioner faced once the examination ended. Thus, . . . the pre-polygraph Miranda waiver did not render the proffer statement voluntary." In any event, the Petitioner's October 19, 1995 statement to authorities was essentially the same as, and resulted in, his October 20, 1995 proffer statement. The evidence at the evidentiary hearing established that the Petitioner did not receive Miranda warnings prior to giving his statement on October 19.

He was arrested that day when he tried to leave the district attorney's office. Therefore, we disagree with the post-conviction court's conclusion that the Petitioner was "in custody" when he gave his proffer statement. Because he was not in custody when he gave the statement, Miranda warnings were not required.

We also conclude that the Petitioner's proffer statement was not the "fruit" of his March 21, 1994 statement. At the time of the March 21 statement, the Petitioner was in jail for the Grandpa's charge. However, the Petitioner's being in custody on another charge does not automatically trigger the "in custody" portion of the Miranda requirement. State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998).

> [A]n inmate is not in custody for Miranda purposes unless there is an added imposition on the inmate's freedom of movement. Relevant to this determination is (1) the language used to summon the inmate, (2) the physical surroundings of the interrogation, (3) the extent to which he is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain the inmate. We agree that this standard is best suited to determine whether Miranda warnings must precede questioning in a prison setting, given the fact that a prisoner would always believe that he was not free to leave the prison.

Id. Even if the Petitioner did not receive Miranda warnings prior to his March 21, 1994 statement, the Petitioner volunteered his information to the authorities. He was not confronted with evidence of his guilt during the interview, and nothing indicates that additional pressure was exerted to detain him. Therefore, he was not in custody for Miranda purposes when he gave his March 21 statement. As a result, trial counsel were not ineffective for failing to challenge the admissibility of the proffer statement pursuant to Miranda.

### E. Use of Investigators from Matthews's Case

Finally, the State contends that the post-conviction court erred by concluding that the Petitioner received the ineffective assistance of counsel because trial counsel retained the services of Mathews's former investigators. The State argues that trial counsel recognized the conflict of interest, decided to waive the conflict, and acted reasonably because the investigators were qualified, experienced, and already familiar with the crimes. The State also contends that even if counsels' hiring the investigators constituted deficient performance, the Petitioner cannot establish prejudice because different investigators would not have had access to Mathews's statements. The Petitioner contends that the post-

conviction court's ruling was correct. We agree with the State that the Petitioner cannot establish prejudice.

In its order granting post-conviction relief, the post-conviction court determined that a conflict of interest existed for the investigators who worked on both cases because the investigators were unable to reveal "vital information" to the Petitioner, specifically that Mathews's had told them he acted alone in the crimes. The court also determined that trial counsel knew or should have known about the investigators' "limitations." Without addressing prejudice, the court concluded that trial counsel's retaining the investigators resulted in the Petitioner's receiving the ineffective assistance of counsel.

Co-counsel and lead counsel testified that they did not think a conflict of interest existed for investigators working on both cases. Ron Lax, the owner of Inquisitor, Inc., testified that he was concerned about a conflict initially but that Mathews's attorneys told him a conflict would not exist if the investigators did not reveal to co-counsel and lead counsel any information they received from Mathews. However, Lax acknowledged that investigators were obligated to keep clients' information confidential, that they were obligated to share information with clients, and that his company owed a duty of loyalty to both Mathews and the Petitioner. Therefore, we agree with the post-conviction court that a conflict of interest existed for the Petitioner's investigators, who learned exculpatory, yet privileged, information from Mathews that they could not share with the Petitioner. Nevertheless, we agree with the State's argument that the Petitioner cannot show prejudice. Had trial counsel for the Petitioner retained the services of different investigators, nothing indicates that those investigators would have had access to the privileged information Mathews gave to his investigators or attorneys. Therefore, the post-conviction court erred by determining that the Petitioner received the ineffective assistance of counsel for trial counsel's retaining the services of Mathews's investigators.

In sum, we conclude that the post-conviction court erred by granting relief to the Petitioner on the grounds that his trial counsel were ineffective for failing to challenge the admissibility of the proffer statement pursuant to Miranda and for retaining investigators who had worked on Mathews's case. However, we affirm the court's granting post-conviction relief on the basis that the Petitioner received the ineffective assistance of counsel for trial counsel's (1) failing to challenge the State's declaration of a material breach; (2) failing to challenge the State's unilateral power to declare a breach; and (3) failing to challenge the admissibility of the proffer statement pursuant to Rule 410, Tennessee Rules of Evidence.

## IV. Error Coram Nobis Analysis

The State also challenges the post-conviction court's granting the Petitioner's petition

for writ of error coram nobis. The State argues that the petition was barred by the one-year statute of limitations and that due process did not toll the statute of limitations. The Petitioner contends that the post-conviction court properly granted his petition for writ of error coram nobis. We conclude that the post-conviction court erred by granting the petition.

The Petitioner filed his "Amended Petition for Post-Conviction Relief and, Alternatively, Motion for Writ of Error Coram Nobis" on January 30, 2009. In the petition for writ of error coram nobis, the Petitioner alleged actual innocence based on newly discovered evidence. Specifically, the Petitioner argued that the newly discovered evidence was testimony Mathews now could be compelled to give about the crimes. The State filed a motion to dismiss the petition for writ of error coram nobis on the basis that the Petitioner filed it outside the one-year statute of limitations. The Petitioner responded that the newly discovered evidence did not become available until Mathews's convictions became final on September 6, 2008, and, therefore, that the one-year statute of limitations should be tolled.

In a written order filed on November 30, 2009, the post-conviction court denied the State's motion to dismiss the petition for writ of error coram nobis, concluding that due process required tolling the one-year statute of limitations. In its order, the post-conviction court noted that Mathews had been called to testify at the Petitioner's 1997 trial but that Mathews had asserted his Fifth Amendment privilege against compulsory self-incrimination under the United State and Tennessee Constitutions.[9] The court concluded that because Mathews's convictions became final on September 6, 2008, and no further criminal proceedings were pending against him, he was no longer entitled to assert the privilege. Therefore, Mathews's testimony, which was previously unavailable, was now available, and the Petitioner should be given an opportunity to establish his claim of actual innocence based on Mathews's testimony.

The Petitioner did not attach to his petition an affidavit from Mathews asserting the Petitioner's innocence. Moreover, the Petitioner did not call Mathews as a witness at the evidentiary hearing.[10] According to the post-conviction court's order granting coram nobis relief, the Petitioner argued at the conclusion of the hearing that the testimony of Skip Gant and Inquisitor's employees constituted the newly discovered evidence because the witnesses had testified that Mathews claimed he acted alone in the crimes. The post-conviction court

_____

[9]According to the trial transcript, the Petitioner called Mathews to testify at trial. Mathews's trial attorney, Jim Simmons, announced in the jury's presence that he had spoken with Mathews and that Mathews wanted to invoke his Fifth Amendment right against compulsory self-incrimination.

[10]During the hearing, counsel for the Petitioner advised the post-conviction court that the Petitioner had subpoenaed Mathews but that "we made a determination not to call him and we released the subpoena."

agreed with the Petitioner.

Tennessee Code Annotated section 40-26-105(a) and (b) provide as follows:

> There is hereby made available to convicted defendants in
> criminal cases a proceeding in the nature of a writ of error
> coram nobis, to be governed by the same rules and procedure
> applicable to the writ of error coram nobis in civil cases, except
> insofar as inconsistent herewith. . . . Upon a showing by the
> defendant that the defendant was without fault in failing to
> present certain evidence at the proper time, a writ of error coram
> nobis will lie for subsequently or newly discovered evidence
> relating to matters which were litigated at the trial if the judge
> determines that such evidence may have resulted in a different
> judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound
discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App.
1995).

A writ of error coram nobis must be filed within one year after the judgment becomes
final in the trial court. Tenn. Code Ann. § 27-7-103. However, the one-year statute of
limitations may be tolled on due process grounds if a petition seeks relief based upon newly
discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn.
2012). Our supreme court has stated, "In determining whether tolling of the statute is proper,
the court is required to balance the petitioner's interest in having a hearing with the interest
of the State in preventing a claim that is stale and groundless." Id. In general, "'before a
state may terminate a claim for failure to comply with . . . statutes of limitations, due process
requires that potential litigants be provided an opportunity for the presentation of claims at
a meaningful time and in a meaningful manner.'" Id. (quoting Burford v. State, 845 S.W.2d
204, 208 (Tenn. 1992)). Our supreme court described the three steps of the "Burford rule"
as follows:

> "(1) determine when the limitations period would normally have
> begun to run; (2) determine whether the grounds for relief
> actually arose after the limitations period would normally have
> commenced; and (3) if the grounds are 'later-arising,' determine
> if, under the facts of the case, a strict application of the
> limitations period would effectively deny the petitioner a
> reasonable opportunity to present the claim."

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)). "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." State v. Harris, 301 S.W.3d 141, 145 (Tenn. 2010).

Applying the first step of the Burford rule, the limitations period normally would have begun to run on March 7, 2002, thirty days after the trial court denied the Petitioner's motion for a new trial on February 5, 2002. See id. at 144 (Tenn. 2010) (stating that the statute of limitations is "computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion"). Therefore, the statute of limitations would have expired on March 8, 2003, almost six years before the Petitioner filed his petition for writ of error coram nobis.

For the second step in the analysis, we are required to determine whether the Petitioner's ground for relief actually arose after the limitations period normally would have commenced. The Petitioner contends that the newly discovered evidence did not become available until September 6, 2008, "the date on which Mathews exhausted his direct appeals and his conviction for the Taco Bell murders became final." The Petitioner argues that, at that point, critical evidence from previously unavailable sources became available.

In support of his claim, the Petitioner cites Taylor v. State, 171 S.W.2d 403 (Tenn. 1943). In Taylor, the defendant argued that he was entitled to a new trial based upon newly discovered evidence in the form of two witnesses who had been unavailable to testify at trial. Id. at 404. One of the witnesses had been in the hospital, and the other had been working out of state. Id. Although the witnesses had refused to give a statement prior to the defendant's trial, both later agreed to testify in the event the defendant was granted a new trial. Id. Our supreme court explained,

> It is possible that the trial Judge took the view that the evidence
> was not newly discovered, since defendant and counsel knew of
> it during and before the trial. But, although not newly
> discovered evidence, in the usual sense of the term, it's
> availability is newly discovered, to which the same principle
> applies.

Id. at 405; see also Harris, 301 S.W.3d at 160-61 (Koch, J., concurring) (citing Taylor for the "narrow exception" to the rule that the newly discovered evidence must have been unknown to the defendant at the time of trial"). The Petitioner also cites to numerous cases outside of this jurisdiction which have held that testimony from a witness, who previously refused to

testify by asserting the constitutional privilege against self-incrimination, is considered newly discovered evidence. See United States v. Guillette, 404 F. Supp. 1360, 1372-74 (D. Conn. 1975); State v. Williams, 246 So. 2d 4, 6 (La. 1971); Commonwealth v. Brown, 431 A.2d 343, 344 (Pa. Super. Ct. 1981); State v. Gerdes, 258 N.W.2d 839, 843 (S.D. 1977) (citing Taylor, 171 S.W.2d at 405).

Under Taylor, we conclude that the newly discovered evidence alleged by the Petitioner in his petition for writ of error coram nobis did not become available until after the limitations period normally would have commenced. Moving to the third step of the Burford rule, the Petitioner filed his petition for writ of error coram nobis in January 2009, just four months after the alleged newly discovered evidence became available. Thus, we conclude that the post-conviction court did not err by determining that due process tolled the statute of limitations.

Next, we will address whether the newly discovered evidence alleged by the Petitioner was sufficient to support the petition for writ of error coram nobis. The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999). By its terms, the statute is "confined" to cases in which errors exist outside the record and to matters that were not previously litigated. Tenn. Code Ann. § 40-26-105(b).

Our supreme court has stated that when examining a petition for writ of error coram nobis, a trial court is to

> first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1100, at **36-37 (Nashville, Oct. 7, 2005)). "A court abuses its discretion when it applies an incorrect legal standard or

its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012).

Turning to this case, the Petitioner has no guarantee that Mathews would testify for him at a second trial. To the contrary, Mathews refused to sign an affidavit exonerating the Petitioner before the Petitioner's first trial, refused to testify for the Petitioner at the trial, and did not testify for him at the post-conviction evidentiary hearing.[11] Likewise, nothing guarantees that Skip Gant or the Inquisitor employees would be willing or able to testify about statements Mathews made to them. The statements were privileged, and Mathews has given no indication that he would waive that privilege. In fact, Mathews's attorney informed the post-conviction court during the evidentiary hearing that Mathews refused to waive any privilege. Furthermore, counsel for Gant and Lax objected to their having to testify about privileged statements Mathews made to them, but the post-conviction court overruled the objections. We note that in its order granting writ of error coram nobis relief, the post-conviction court stated that "it is reasonable to assume that the trial court would have upheld any assertion by Mr. Lax or other Inquisitor employees that, based upon the attorney-client privilege, Inquisitor employees were prevented from divulging the contents of any conversation between Mr. Mathews and Inquisitor employees." In short, because nothing demonstrates that the witnesses would be any more available at a second trial than they were at the first trial, we conclude that the post-conviction court abused its discretion by granting the petition for writ of error coram nobis.

## V. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's granting the petition for post-conviction relief. Although the post-conviction court erred by granting relief on the grounds that the Petitioner's trial counsel were ineffective for failing to challenge the admissibility of the proffer statement pursuant to Miranda and for retaining investigators who had worked on Mathews's case, the court correctly determined that the Petitioner received the ineffective assistance of counsel for trial counsel's (1) failing to challenge the State's declaration of a material breach; (2) failing to challenge the State's unilateral power to declare a breach; and (3) failing to challenge the admissibility of the proffer statement pursuant to Rule 410, Tennessee Rules of Evidence. Regarding the petition for writ of error coram nobis, we again conclude that the post-conviction court erred by granting relief. Nevertheless, because the Petitioner has shown that he is entitled to post-conviction relief based upon his receiving the ineffective assistance of

---

[11]We note that during the hearing, counsel for the Petitioner advised the post-conviction court that Mathews had signed an affidavit stating that he would never testify "before this Court."

counsel at trial, the case is remanded to the trial court for further proceedings consistent with this opinion.

_____

NORMA McGEE OGLE, JUDGE